237 P.3d 944 (2010)
In re the WELFARE OF L.N.B.-L., Indian Child.
In re the Welfare of A.D.B.-L., Indian Child.
Nos. 38850-2-II, 38854-5-II.
Court of Appeals of Washington, Division 2.
August 3, 2010.
*948 Lise Ellner, Attorney at Law, Vashon, WA, Eric J. Nielsen, Christopher Gibson, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellants.
Barbara Noel Bailey, Attorney General's Office, Tacoma, WA, for Respondent.
PENOYAR, C.J.
¶ 1 JB-L and KL, the mother and father, respectively, of four-year old LNB-L and three-year old ADB-L,[1] appeal the juvenile court's order terminating their parental rights. LNB-L and ADB-L each qualify as an "Indian child" under the Indian Child Welfare Act (ICWA).[2] JB-L and KL assign error to several findings of fact and conclusions of law, and they assert that the Department of Social and Health Services failed to establish several elements of RCW 13.34.180(1)[3] and ICWA. The parents raise *949 numerous other arguments, including the Department's alleged failure to provide proper notice to Indian tribes that had an interest in the proceedings. We affirm the termination orders, but we hold that the Department should have notified two additional tribes of the termination proceedings. Therefore, we remand for proper notice. If the notified tribes decline to intervene, the termination orders will stand. If either of the tribes chooses to intervene, the juvenile court shall hold further proceedings consistent with this opinion.

FACTS
¶ 2 In December 2005, Child Protective Services (CPS) received referrals raising concerns about then-newborn LNB-L's feeding and weight gain,[4] and JB-L's ability to care for him alone. On December 29, a social worker visited JB-L's residence. At the time, KL was in jail for a probation violation. The social worker observed a heater on "full blast" near flammable items, an inoperative smoke detector, a kitchen counter and sink full of dirty dishes, garbage on the floor, and caked-on food matting the carpet. Ex. 1 at 3; Ex. 8 at 3. The home had a strong odor, and LNB-L's hair contained flea eggs. CPS placed LNB-L in protective custody.

I. Dependency
¶ 3 On June 30, 2006, the juvenile court found LNB-L dependent because he lacked a "parent, guardian or custodian capable of adequately caring" for him. Former RCW 13.34.030(5)(c) (Laws of 2003, ch. 227, § 2). The court's dispositional order required JB-L to complete a parenting evaluation; attend parenting classes; receive medical care for her health problems, including cirrhosis; receive counseling to address psychological issues, including the impact of domestic violence; secure and maintain stable housing free of drug or alcohol use and domestic violence; and work with a public health nurse to learn to care for LNB-L. The court's dispositional order required KL to comply with most of these same requirements and to complete psychiatric and drug and alcohol evaluations;[5] receive medical care for neurological issues; receive counseling to address psychological issues and learn coping skills; and complete a one-year domestic violence perpetrator treatment program.
¶ 4 During LNB-L's dependency, JB-L was pregnant with ADB-L. She participated in a high-risk pregnancy program at the University of Washington.[6] JB-L attended classes with KL, but the university eventually ejected KL from the program due to his volatile behavior. As a result, JB-L cancelled her appointment to induce labor at the university, despite her high-risk status, in order to find a location where KL could attend the birth. JB-L gave birth to ADB-L in a Silverdale hospital.
¶ 5 Shortly after ADB-L's birth on January 5, 2007, the Department filed a dependency petition because of its continuing concerns about JB-L's and KL's ability to parent. After a hearing in July 2007, the juvenile court found ADB-L dependent. The juvenile court issued an additional dispositional order with regard to ADB-L that required JB-L to obtain medical coverage for herself; work to develop independent living skills, including learning about financial decisions; and complete a class entitled "Parenting Children who have witnessed Domestic Violence." Ex. 16 at 4. The court ordered KL to provide random urinalysis (UA) samples; demonstrate the skills he had learned in parenting classes during visitation; and receive medical care for a diagnosed mood disorder.

*950 A. Tribal Membership and Affiliation
¶ 6 JB-L is an enrolled member of the Nooksack Tribe, a federally recognized tribe, and the Squamish Nation,[7] a Canadian tribe that is not federally recognized. See Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 74 Fed.Reg. 40218, 40219-22 (Aug. 11, 2009). KL describes his heritage as "Cherokee and Black Foot out of the Algonquin Nation," but he is not a member of those tribes. Report of Proceedings (RP) at 538. The dependency petitions note that JB-L is a member of the Squamish Nation, and that KL "has Cherokee and Black Foot ancestry, but is not enrolled." Ex. 1 at 2; Ex. 8 at 2. The Cherokee Nation is a federally recognized tribe. 74 Fed.Reg. 40218, 40219 (Aug. 11, 2009). There is insufficient evidence in the record to determine whether KL's "Black Foot ancestry" refers to the federally-recognized Blackfeet Tribe of the Blackfeet Indian Reservation of Montana.[8] Ex. 1 at 2; Ex. 8 at 2; see 74 Fed.Reg. 40218, 40219 (Aug. 11, 2009).
¶ 7 As we noted above, LNB-L is an enrolled Nooksack member and ADB-L is eligible for enrollment in the Nooksack Tribe. The record is unclear as to whether LNB-L and ADB-L are members or are eligible for membership in the Squamish, Cherokee, or Black Foot Tribes.

B. Nooksack Tribe's Involvement
¶ 8 The Department notified the Nooksack Tribe about the family, and the Nooksack Tribe became involved in 2006.[9] Elizabeth Paez served as the Nooksack's Indian Child Welfare (ICW) case manager for LNB-L and ADB-L. At the termination hearing, Paez testified that the Squamish Nation declined to intervene in the dependencies.
¶ 9 During the dependency, Paez participated telephonically in approximately ten meetings with the Department and one or both parents. Paez did not meet JB-L and KL until August 2007 when she and other tribal employees traveled to Port Orchard to help the parents "get into services ... so that they could regain their children back." RP at 597. That meeting lasted four hours, and the children were not present. Paez and another tribal employee helped KL to arrange mental health and alcohol services. Nooksack employees also tried to help JB-L obtain insurance so that she could receive her medication at a reduced price, but JB-L lacked the necessary paperwork. At that meeting, KL had an "outburst[]" that "left [JB-L] in tears." RP at 576.
¶ 10 In October 2007, Paez tried to meet with KL and JB-L for a second time at the site where KL and JB-L visited the children. KL notified Paez that he did not want to speak with her because Paez had arrived late to the meeting. Paez then spent about an hour with the children at the foster home. She noted that the foster home was appropriate and that the children seemed happy.[10] After the failed meeting, JB-L called Paez several times to notify her that she was faxing documents regarding KL's medications. Aside from those phone calls, Paez had no further contact with KL or JB-L.

C. Housing
¶ 11 In 2006, the Department assisted JB-L and KL to obtain housing at Quail Hollow Apartments, and it helped pay the first month's rent. In August 2006, the Department's ICW social worker, Hunter Morrigan, *951 visited the residence. Morrigan observed no safety concerns, noting that the home was clean, contained food and adequate furniture, and smelled pleasant. Morrigan never entered the home again; she believed that KL and JB-L knew how to keep their home clean.
¶ 12 While at Quail Hollow, KL and JB-L received several three-day notices for nonpayment, and their neighbors complained about noise. On some occasions, when Quail Hollow's assistant manager sent KL and JB-L notices for rent delinquency or noise violations, KL appeared in the assistant manager's office and yelled at her. Sometimes KL appeared intoxicated. The assistant manager felt threatened by KL's behavior, and she was concerned for JB-L's safety because JB-L sometimes cried in the assistant manager's office. In July 2008, Quail Hollow declined to renew KL and JB-L's lease because other residents threatened to move out if KL and JB-L remained. Afterwards, KL and JB-L stayed with relatives and friends. At trial, JB-L stated that she was homeless and had applied for low-income housing.

D. Substance Abuse
¶ 13 In 2006, KL refused to complete a drug and alcohol assessment after two referrals by the Department. Beginning in 2007, KL changed course and completed substance abuse evaluations at three different agencies. The first two agencies recommended inpatient treatment and intensive outpatient treatment, respectively, neither of which KL completed.
¶ 14 In 2006 or 2007,[11] KL obtained a medical marijuana license in order to treat seizures, asthma, and back pain. KL testified that he spends $100 per month on marijuana, smokes three "bowls" per day, and obtains the marijuana from "the people I got it from on the streets." RP at 200-01. JB-L buys $20-$40 of marijuana for KL per month out of her monthly budget of about $630.
¶ 15 KL's third and most recent substance abuse evaluation in March 2008 found that "due to [KL]'s refusal to abstain from marijuana... he would only be served by a harm-reduction program."[12] RP at 713. KL expressed willingness to participate in a harm-reduction program. Morrigan testified:
I did quite a bit of research in an attempt to try to look at what [a harm-reduction program] meant and where those are located. There were none in this area. And the descriptions of the programs did not seem to address the safety issues that a parent would have with regard to appropriately parenting their children while receiving that form of treatment. So that ended there.
RP at 713-14. Bill NeSmith, a former Department social worker who worked for KL during the dependency proceedings, discovered a program in Bellevue that he believed to be a harm-reduction model.[13] He provided this information to KL's attorney.
¶ 16 Although the juvenile court's second dispositional order required KL to participate in random UAs, he refused because "[m]y children were not taken for drugs or alcohol. There's no use for them." RP at 235. At two of the three substance abuse evaluations, KL provided urine samples, both of which tested positive for marijuana and alcohol.
*952 ¶ 17 On two occasions during the dependencies, KL became involved with police due to extreme intoxication; one incident led to KL's arrest for harassment. KL stated that he became more assertive when he drank but that he had recently stopped drinking at the advice of his attorney.
¶ 18 In January 2006, JB-L completed a drug and alcohol evaluation. The evaluator found insufficient evidence to establish alcohol abuse or dependence and did not recommend treatment.

E. Domestic Violence
¶ 19 In 2004, KL entered an Alford[14] plea to fourth degree assault, domestic violence against JB-L. JB-L has continuously denied that KL has domestic violence issues. With regard to the 2004 conviction, JB-L explained that KL "grabbed" her because they were late for a bus and he wanted her to run. RP at 131. Morrigan witnessed KL publicly, sometimes in front of the children, yell at and demean JB-L and blame her for the children's removal from their care.
¶ 20 Police also arrested KL several times on domestic violence charges against his mother. In 2001, KL entered an Alford plea to a harassment charge involving his mother and the court entered a no contact order. In 2005, KL entered an Alford plea to fourth degree assault, domestic violence against his mother, and the court entered a no contact order. KL claimed his mother always called the police on him "for nothing."[15] RP at 207.
¶ 21 In September 2006, KL began a domestic violence treatment program to which the Department had referred him. Julie Elkinton, a licensed mental health counselor and certified domestic violence treatment provider, led the Department-certified program. KL attended the program "fairly regular[ly]" and did well. RP at 918. Elkinton did not perceive KL to have anger issues and did not observe him become angry. KL brought JB-L to two or three individual sessions with Elkinton in order to work on their communication. Elkinton did not observe any behavior to make her believe that KL would endanger the children. Elkinton stated, "I would like to see [KL] have an opportunity to father his children." RP at 948.

F. Mental Health
¶ 22 On March 29, 2006, before the juvenile court's determination that LNB-L was dependent, clinical psychologist Dr. Lawrence Majovski performed a psychological evaluation and parenting assessment of JB-L. Dr. Majovski's evaluation appears to have served as the basis for some of the court's requirements in the initial dispositional orders. Dr. Majovski concluded that JB-L had average cognitive abilities and that she experienced denial, conformity, tension, insecurity, and inadequacy. Dr. Majovski recommended parenting classes focusing on nurturance, compliance with regard to her medications, and counseling with regard to parenting issues and basic living skills.
¶ 23 Dr. Majovski observed KL and JB-L with LNB-L and noted that KL appeared controlling and verbose whereas JB-L appeared passive, nurturing, and submissive to KL. KL appeared affectionate but authoritarian, attempting to express feelings and thoughts for LNB-L. JB-L presented within the average range on a parenting stress inventory and parent-child relationship inventory. Dr. Majovski noted that JB-L was bonded to LNB-L. He concluded that JB-L was a safer parent for LNB-L and that "there are no serious concerns that she poses a [risk of] harm to her son." Exhibit 48 at 12.

G. Visitation
¶ 24 For most of the dependencies, KL and JB-L had two supervised visits per week for two hours each with the children. JB-L and KL attended nearly every visit, enduring two-hour bus rides each way to and from visits. The Department provided the parents with monthly bus passes. KL played *953 with the children and appeared affectionate, singing to them and often telling them he loved them. JB-L held and comforted the children in her lap, changed their diapers, brought and prepared food at almost every visit, gave the children toys, and played with them on the floor. The Department provided JB-L with a list of the foods that the children were allergic to, but she sometimes brought foods that the children could not eat. Because neither parent demonstrated improved parenting skills at the visits, despite attending parenting classes, the Department provided them with a public health nurse who could give one-on-one parenting instruction during visits.
¶ 25 During visits, KL tended to be emotionally volatile and angry. He argued with JB-L, made inappropriate comments about people, attempted to engage in activities that were not age-appropriate for the children, and talked to the children about the case. When KL became volatile, JB-L had little or no reaction, while the children would stop what they were doing, become extremely serious, and seek comfort from JB-L or the visit supervisor.
¶ 26 In June 2008, the Department sought to terminate KL's visits because his volatility scared the children. LNB-L had started acting out in his foster home on the days surrounding visits, displaying aggression and escalating behavior.[16] The juvenile court terminated KL's visits, and the Department decreased JB-L's visits to once per week.

II. Termination
¶ 27 On February 6, 2008, the Department petitioned for termination. The Nooksack Tribe appeared through its counsel on the first day of the proceedings and stated:
I actually am not available to participate throughout the entire trial. I did file a motion with the court requesting this partial participation.... What I intend to do, Your Honor, is to participate in this morning's session so that I can familiarize myself with the partieswell, refamiliarize myself, hear the testimony until court adjourns for this morning, and then be available when Elizabeth Paez, the Nooksack Indian expert, testifies, so that I am available for testimony during that and then to participate in closing as well, Your Honor.
RP at 3. The tribe participated consistent with its counsel's representations, except that it did not participate in closing argument.
¶ 28 Morrigan testified extensively on the Department's behalf. Morrigan had worked as an ICW social worker for about ten years, assisting over 100 Native American families. She is of Lakota Sioux heritage but is not a tribal member. She has no specific training or education in Nooksack child-rearing practices, but she testified that tribes of the Salishan language group, to which the Nooksack Tribe belongs, had provided her with numerous trainings about culturally appropriate services. Morrigan observed six visits between the children and both parents.
¶ 29 Morrigan testified that KL felt the Department had illegally kidnapped his children and was not receptive to information regarding the court's orders or the Department's view of his parental deficiencies. KL participated in a family preservation assessment, a psychological parenting evaluation with Dr. Majovski, parenting classes, three mental health evaluations, a domestic violence evaluation, and domestic violence treatment. KL did not complete the domestic violence treatment program. KL maintained only sporadic contact with the Department and refused to sign several necessary releases. Morrigan observed that during the dependencies, KL either made no progress in correcting his parenting deficiencies or made further declines in his parenting abilities. According to Morrigan, the Department had offered KL all services reasonably available and capable of correcting his parenting deficiencies in the foreseeable future.
¶ 30 Morrigan testified that JB-L completed most available services that the Department required and took additional parenting *954 classes.[17] JB-L appeared "quite good at negotiating the network of available social services." RP at 764. Over the two years in which JB-L engaged in these services, however, Morrigan observed minimal progress toward remedying her parenting deficiencies. Morrigan opined that no other reasonably available services would be capable of correcting JB-L's parenting deficiencies in the near future.
¶ 31 Morrigan concluded that termination was in the children's best interests. She stated that there was little or no likelihood that KL or JB-L could remedy conditions in the near future so that the children could be returned to them and that continuation of the parent-child relationships would diminish the children's prospects for integration into a stable and permanent home. Morrigan believed that continued custody of the children by KL or JB-L would likely result in serious emotional or physical damage to the children because JB-L could not protect the children and because of untreated substance abuse, mental health, and domestic violence issues. The possibility of JB-L divorcing KL and parenting without him came up numerous times during the dependencies, but Morrigan testified that JB-L would be unable to parent independently. JB-L was "[un]likely to do well living on her own by herself, much less with children with their needs." RP at 768. JB-L would require assistance and support from other people and a residence where KL could not find her in order to protect herself and the children from KL. The Guardian Ad Litem (GAL) concurred that terminating JB-L and KL's parental rights would be in the children's best interests.
¶ 32 Paez testified that the Nooksack Tribe also supported termination. She identified KL and JB-L's parenting deficiencies as untreated mental health issues in addition to domestic violence and substance abuse in the home. Paez noted that "it would be hard for [JB-L] to protect herself and the children from [KL] and also with his outbursts from his [domestic violence] and his drinking." RP at 575. Paez stated that her opinion on substance abuse relied solely on information the Department provided, and she acknowledged that JB-L never complained of domestic violence. Paez noted that the tribe made active efforts to provide services to KL and JBL and concluded that if the children remained in the parents' custody, they would likely suffer serious emotional or physical damage because of domestic violence, drinking, and KL's use of medical marijuana in the home.[18]
¶ 33 Before the proceedings, the Nooksack Tribe passed a resolution that designated Paeza member of the tribe and a resident of the Nooksack community for 40 yearsas a qualified expert in state court proceedings involving the placement of tribal children.[19] Paez took online training courses on ICWA, and had worked as an ICW case manager for seven years. During cross-examination, JB-L's counsel repeatedly asked Paez to explain Nooksack child-rearing practices:
[Counsel]: As a tribal expert, you have particular knowledge regarding family organization; is that correct?
[Paez]: Correct.
[Counsel]: And could you describe for us what the Nooksack family organization is and how that would apply to this case?
[Paez]: I'm not quite sure what you are asking for.
[Counsel]: Well, the law requires that as a qualified Indian expert that you have specialized knowledge in tribal customs *955 and how they pertain to family organization. I'm asking you what the Nooksack tribal family organization would be and how it applies to this case.
[Paez]: Uhm, are you asking about the unit, the family unit, or
[Counsel]: Well, I'm asking you as an expert, as the qualified Indian expert, what you can tell us about the Nooksack family organization and tribal customs?
. . . .
[Paez]: Generally we like to keep the unit, the family unit intact, so long as they're doing whatthe parents are doing what they're supposed to be doing and participating in the classes that they ... And in order for us, I guess, to ask for a termination, I have to appear in front of tribal counsel. Is that kind of answering your question?
[Counsel]: Well, it seems as if you have answered it to the best of your ability. Is that right?
[Paez]: Right. Because I'm real confused as to it.
[Counsel]: Okay. What can you tell us about Nooksack tribal child rearing practices?
[Paez]: Regarding to termination?
[Counsel]: No. As an IndianAs a qualified Indian expert, your area of expertise, you are supposed to be able to describe or be knowledgeable in the tribal child rearing practices. I'm asking what you can tell us about those tribal rearing practices.
[Paez]: I mean, other than keeping the families intact and there being a mother and a father with the children in a healthy, safe environment, I'm very confused on your question.
RP at 580-82.
¶ 34 The State objected to this line of questioning, asserting that an Indian expert did not necessarily need to know "the specific child rearing practices of a specific tribe." RP at 582. The juvenile court responded:
Okay. Well, it's appropriate cross-examination to question the expertise of the expert. I'm going to let [JB-L's counsel] continue with her examination and overrule the objection.
At some point we may also address, as there's a formal objection, the question of whether Ms. Paez qualifies as an ICWA expert. But let's finish all of her testimony before we get there.
RP at 584. The parties never re-addressed Paez's designation as an expert witness. The Nooksack Tribe's counsel subsequently attempted to rehabilitate Paez.
¶ 35 Clinical psychologist Dr. Michael O'Leary testified for the Department. Dr. O'Leary conducted a forensic review that focused on ascertaining uniformity among the various case reports. Dr. O'Leary never met either parents. Based on visitation notes, Dr. O'Leary stated that KL was overbearing, irritable, belligerent, demeaning, and had unrealistic expectations of the children's level of comprehension, which would put the children's safety at risk. Dr. O'Leary noted that a chemical dependency professional diagnosed KL with bipolar disorder, which could increase the children's risk for mood disorders, maladjustment, and behavior problems. Dr. O'Leary questioned whether KL actually had seizures or just a "pseudoseizure disorder," and Dr. O'Leary opined that KL's marijuana use might prevent him from controlling his impulses or safely supervising the children. RP at 257. But Dr. O'Leary noted that, if KL did have a seizure disorder and failed to treat it, he could present a risk of harm to the children.
¶ 36 Regarding JB-L, Dr. O'Leary was primarily concerned about her passivity and her inability to safely protect the children from KL. He stated that passivity is not necessarily damaging to a child, and he agreed that JB-L was able to direct and provide structure to her children.
¶ 37 Dr. O'Leary concluded that neither KL nor JB-L, together or singly, could safely parent the children. He believed there was no likelihood that KL and JB-L could remedy their parenting deficiencies in the near future. He stated that continuation of their parent-child relationships would seriously harm the children. Dr. O'Leary concluded that KL and JB-L would not benefit from additional services. Dr. O'Leary believed *956 that KL would physically and mentally abuse the children on a daily basis and that JB-L would be unable to prevent it.
¶ 38 NeSmith, a child welfare social worker in private practice who had previously worked for the Department for over 21 years, testified as part of KL's case. NeSmith spent about 150 hours in face-to-face contact with JB-L and KL, including attending 15 to 17 visits with the children. NeSmith observed that both JB-L and KL "met the cues of the children," made good eye contact, got down onto the floor to play, changed diapers, and always came prepared with food and drink for the children. RP at 1038. NeSmith observed that the children were bonded with their parents and never seemed scared of their parents. NeSmith testified that JB-L told him that KL was not violent with her. NeSmith visited JB-L and KL's home six to seven times and noted that it was "pretty clean." RP at 1079.
¶ 39 After an eight-day trial, the juvenile court terminated KL and JB-L's parental rights as to both children. KL and JB-L appealed.
¶ 40 A commissioner of this court heard oral argument on an accelerated basis pursuant to RAP 18.13A. The commissioner referred this matter to a full panel of judges.

ANALYSIS

I. Notice to Indian Tribes
¶ 41 JB-L contends that the Department should have notified the Squamish Nation of the termination proceedings. In a supplemental brief, KL argues that the Department was required to "provide notice of the termination proceedings to all potentially interested tribes, including the Squamish." Supp. Br. of Appellant KL at 3. We conclude that ICWA and state law required the Department to notify the Cherokee and Black Foot[20] tribesbut not the Squamish Nationof the termination proceedings. Because the Department failed to notify the Cherokee and Black Foot tribes, we remand for proper notice to these two tribes.
¶ 42 When interpreting a statute, our primary goal is to effectuate legislative intent. City of Seattle v. St. John, 166 Wash.2d 941, 945, 215 P.3d 194 (2009) (citing In re Custody of Shields, 157 Wash.2d 126, 140, 136 P.3d 117 (2006)). Where the statute's meaning is plain and unambiguous, we derive legislative intent from the statute's plain language. St. John, 166 Wash.2d at 945, 215 P.3d 194. We discern the plain meaning from "all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 11, 43 P.3d 4 (2002).
¶ 43 The parents' argument that ICWA required the Department to notify the Squamish Nation of the termination proceedings fails because the Squamish Nation is not a federally recognized tribe. Under ICWA, the Department must notify[21] "the Indian child's tribe" of pending termination proceedings and the tribe's right to intervene "where the court knows or has reason to know that *957 an Indian child is involved." 25 U.S.C. § 1912(a). An "Indian child's tribe" is:
(a) the Indian tribe in which an Indian child is a member or eligible for membership or (b) in the case of an Indian child who is a member of or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has the more significant contacts.
25 U.S.C. § 1903(5). An "Indian tribe" is further defined as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary [of the Interior] because of their status as Indians...." 25 U.S.C. § 1903(8) (emphasis added). Thus, these statutory definitions make clear that an "Indian child's tribe" must be federally recognized in order to be entitled to § 1912(a) notice. Because the Squamish Nation is not a federally recognized tribe, § 1912(a) did not require the Department to notify the Squamish Nation of the termination proceedings. See 74 Fed. Reg. 40,218, 40,221 (Aug. 11, 2009).
¶ 44 In contrast, the Cherokee tribe is a federally recognized tribe, and the "Black Foot" tribe may refer to the federally-recognized Blackfeet Tribe of the Blackfeet Indian Reservation of Montana. See 74 Fed.Reg. 40218, 40219 (Aug. 11, 2009). Because the Department stated in LNB-L's dependency petition that KL was affiliated with the "Cherokee/Black Foot" tribes, the juvenile court knew or had reason to know that the termination proceedings involved Indian children. Therefore, the Department had a duty under § 1912(a) to notify these two tribes of the termination proceedings.
¶ 45 After oral argument in this case, we requested supplemental briefing on the application of the notice provisions in RCW 13.34.070(10)(a). The legislature originally enacted these notice provisions in 1979, one year after Congress enacted ICWA. Former RCW 13.34.070(9) (Laws of 1979, ch. 155, § 40). The original notice provisions applied only to Indian children who were Indian tribal members, but the legislature subsequently expanded the provisions to include eligible members as well. Former RCW 13.34.070(10) (Laws of 2000, ch. 122, § 8); former RCW 13.34.070(9). In 2004, the legislature again amended the statute, which now reads:
(a) Whenever the court or the petitioning party in a proceeding under this chapter knows or has reason to know that an Indian child is involved, the petitioning party shall promptly provide notice to ... the agent designated by the child's Indian tribe to receive such notices.... If the child may be a member of more than one tribe, the petitioning party shall send notice to all tribes the petitioner has reason to know may be affiliated with the child.

(b) The notice shall: (i) Contain a statement notifying ... the tribe of the pending proceeding; and (ii) notify the tribe of the tribe's right to intervene and/or request that the case be transferred to tribal court.
RCW 13.34.070(10) (emphasis added); Laws of 2004, ch. 64, § 4. The legislature's addition of the italicized language directed the Department, for the first time, to notify multiple tribes of dependency and termination proceedings if more than one tribe was "affiliated" with the child.
¶ 46 In an earlier withdrawn opinion, we concluded that the "all tribes" language in RCW 13.34.070(10)(a) referred not only to federally recognized tribes, but also to non-federally recognized tribes, like the Squamish. After further consideration, we conclude that the legislature did not intend to expand ICWA's notice requirements to non-federally recognized tribes.[22]
¶ 47 RCW 13.34.070(10)(a) only applies when the court or a petitioning party knows or has reason to know that an "Indian child" is involved. Although that section of the statute does not define "Indian child," several other sections of chapter 13.34 RCW explicitly adopt ICWA's definition of "Indian child." Thus, any party that files a dependency petition must state in the petition "whether the child is or may be an Indian child as defined in 25 U.S.C. Sec. 1903." RCW 13.34.040(3); see also RCW *958 13.34.030(16) (stating that, for an "Indian child as defined in 25 U.S.C. Sec. 1903(4)," the term "sibling" is defined according to tribal law or custom); RCW 13.34.065(4)(h)[23] (requiring the juvenile court to inquire into "[w]hether the child is or may be an Indian child as defined in 25 U.S.C. Sec. 1903" at the shelter care hearing).[24]
¶ 48 ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). As we noted above, ICWA's definition of "Indian tribe" includes only federally recognized tribes. See 25 U.S.C. § 1903(8).
¶ 49 Thus, the plain language of RCW 13.34.070(10)(a) reveals the legislature's intent to limit notice to proceedings that involve an "Indian child" while related statutes in chapter 13.34 RCW disclose the legislature's intent to adopt ICWA's definition of "Indian child." Because an "Indian child" must be a member of, or eligible for membership in, a federally recognized tribe, we conclude that the legislature intended the term "tribe" in RCW 13.34.070(10)(a) to mean "federally recognized tribe." Accordingly, the Department had no duty under RCW 13.34.070(10)(a) to notify the Squamish Nation, a non-federally recognized tribe, of the termination proceedings.[25]
¶ 50 We remand this case to the juvenile court so that the Department may notify the Cherokee and Black Foot tribes of the termination proceedings. Because these tribes may choose not to intervene, we address the parents' other contentions in the remainder of this opinion. We find that the record supports the termination orders and that the parents' remaining claims fail. Thus, on remand, the termination orders will stand unless either of the two tribes intervenes, in which case the juvenile court shall hold further proceedings consistent with this decision.

II. Other ICWA Claims
¶ 51 ICWA requires the Department to show, as a prerequisite to termination, that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). Also, the juvenile court may not order termination under ICWA absent "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). JB-L and KL assert that the Department has failed to meet its burden with regard to these ICWA provisions, and they assign error to the related findings and conclusions. We reject their arguments.

A. Standard of Review
¶ 52 When reviewing a termination order, we uphold a juvenile court's findings of fact if the findings are supported by substantial evidence from which a rational trier of fact could find the necessary facts by *959 clear, cogent and convincing evidence.[26]In re Dependency of K.S.C., 137 Wash.2d 918, 925, 976 P.2d 113 (1999). Clear, cogent and convincing evidence exists when the ultimate fact at issue is "highly probable." K.S.C., 137 Wash.2d at 925, 976 P.2d 113. Substantial evidence is evidence that would persuade a fair-minded rational person of the truth of the declared premise. In re Welfare of C.B., 134 Wash.App. 942, 953, 143 P.3d 846 (2006). Deference to the juvenile court is particularly important in termination proceedings, and we defer to the fact finder on issues of witness credibility and the persuasiveness of the evidence. K.S.C., 137 Wash.2d at 925, 976 P.2d 113; In re Dependency of A.V.D., 62 Wash. App. 562, 568, 815 P.2d 277 (1991).
¶ 53 Unchallenged findings are verities on appeal. In re Interest of Mahaney, 146 Wash.2d 878, 895, 51 P.3d 776 (2002). We review conclusions of law that are mistakenly characterized as findings of fact de novo.[27]In re Disciplinary Proceeding Against VanDerbeek, 153 Wash.2d 64, 73 n. 5, 101 P.3d 88 (2004). An appellant waives an assignment of error when she presents no argument in support of the assigned error. Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992).

B. Findings of Fact

1. Finding XIII
¶ 54 JB-L assigns error to finding XIII:[28] "Notice of this termination fact-finding was provided by certified mail to the NOOKSACK Indian Tribe at least ten days before the hearing. The NOOKSACK Indian Tribe exercised their right to intervene in this proceeding." Clerk's Papers (CP) at 139, 315.
¶ 55 Although the record is unclear as to whether the Department provided the Nooksack Tribe with proper notice, substantial evidence supports the fact that the Nooksack Tribe intervened in the proceedings. The Nooksack's counsel appeared telephonically during trial. He cross-examined JB-L, objected during KL's cross-examination of Paez, and attempted to rehabilitate Paez after the parents challenged her expert qualifications. Near the end of the proceedings, he informed the court that the tribe supported the termination petition. The Nooksack's intervention precludes the need for strict compliance with notice provisions and dispenses with JB-L's argument. See In re Welfare of M.S.S., 86 Wash.App. 127, 134, 936 P.2d 36 (1997) ("[f]ailure to provide the required notice mandates remand unless the tribe has participated in the proceedings or expressly indicated that it has no interest in the proceedings.")

2. Finding XIV
¶ 56 Both JB-L and KL assign error to finding XIV, which states: "Continued custody of the child by [JB-L] and [KL] is likely to result in serious emotional or physical damage to the child. This finding is supported by the testimony of LIZ PAEZ and HUNTER MORRIGAN, qualified expert witnesses under [ICWA]." CP at 139-40, 315-16. KL also argues that the State's expert testimony on "serious emotional or physical damage" was predicated in significant part on evidence of "poverty, inadequate housing, alcohol abuse, [and] non-conforming social behavior." Br. of Appellant KL at 3; *960 see Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed.Reg. at 67584, 67593 (Nov. 26, 1979) (stating that such evidence "does not constitute clear and convincing evidence that continued custody is likely to result in serious emotional or physical damage to the child.").

A. Qualified Expert Witnesses
¶ 57 JB-L and KL assert that Paez and Morrigan[29] were not qualified expert witnesses under ICWA because they did not possess any specialized knowledge or understanding of Squamish or Nooksack culture. This argument fails.
¶ 58 A "qualified expert witness" must have expertise beyond the normal social worker qualifications. In re Matter of Roberts, 46 Wash.App. 748, 755, 732 P.2d 528 (1987). ICWA does not require testimony from more than one qualified expert. Mahaney, 146 Wash.2d at 897, 51 P.3d 776 (quoting Roberts, 46 Wash.App. at 755, 732 P.2d 528). Experts are generally qualified through "`special knowledge of and sensitivity to Indian culture.'" Mahaney, 146 Wash.2d at 897, 51 P.3d 776 (quoting State ex rel. Juvenile Dep't of Multnomah County v. Cooke, 88 Or.App. 176, 744 P.2d 596, 597 (1987)). The Bureau of Indian Affairs (BIA) has issued non-binding guidelines[30] for state courts in Indian child custody proceedings, which include three categories of individuals who are most likely to meet ICWA's "qualified expert witness" requirement:
(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.
(iii) A professional person having substantial education and experience in the area of his or her specialty.
44 Fed.Reg. at 67593. Our Supreme Court has noted that "ICWA has been interpreted to allow some latitude where experts are concerned." Mahaney, 146 Wash.2d at 897, 51 P.3d 776. Because the purpose of the ICWA qualified expert witness provision is to protect against cultural bias, "[w]hen expert testimony is offered that does not inject cultural bias or subjectivity, courts have held that no `special knowledge of Indian life' is required." Mahaney, 146 Wash.2d at 897, 51 P.3d 776 (quoting State ex rel. Juvenile Dep't of Lane County v. Tucker, 76 Or.App. 673, 710 P.2d 793, 799 (1985)).
¶ 59 Despite Paez's difficulty describing a Nooksack family unit, she qualifies as an expert under subsection (i) of the BIA guidelines. Paez is a Nooksack tribal member and the tribe explicitly designated her as an expert "qualified in the placement of tribal children" in state proceedings. Ex. 47. The tribe's official designation of Paez as an expert is sufficient to establish her expertise. Additionally, Paez, a 40-year resident of the tribal community, has worked with over 75 Indian families in the social services setting, has served as ICW case manager for 7 years, and has received training on ICWA. See In re Welfare of Fisher, 31 Wash.App. 550, 553, 643 P.2d 887 (1982) (finding that the trial court did not abuse its discretion by determining that a caseworker supervisor in Seattle Indian Center's foster care program was a qualified expert under ICWA).
¶ 60 Morrigan also qualifies as an expert under the more flexible subsection (iii) of the BIA guidelines. Morrigan has been a social worker for 13 years, having worked with over 100 Indian families in her 10 years in the ICW division. Although she has no particular training or education in Nooksack *961 child-rearing practices,[31] her extensive professional experience with regard to Indian child welfare issues is sufficient for her to be deemed a qualified expert witness. See In re Interest of M.S., 624 N.W.2d 678, 685 (N.D. 2001) (stating that county social worker assigned to mother's case qualified as an ICWA expert where she testified that she was "familiar with Indian customs, traditions, and culture" and where the tribe did not oppose termination).
¶ 61 JB-L relies extensively on State ex rel. Juvenile Department of Multnomah County v. Charles[32] to challenge Paez and Morrigan's qualifications. In Charles, the court stated that the expert requirement was not met when two experienced social workers without "specialized knowledge of social or cultural aspects of Indian life" testified for the State in support of foster care placement. 688 P.2d at 1360. That situation differs significantly from the case at hand. Here, the Nooksack Tribe explicitly designated Paez as having the relevant ICWA expertise in child custody proceedings. Moreover, both Paez and Morrigan, unlike the social workers in Charles, have extensive experience in the field of Indian child welfare. Charles does not support the parents' contentions that Paez and Morrigan lacked the necessary expertise.

B. Serious Emotional and Physical Damage
¶ 62 We reject KL's argument that the State's expert testimony on "serious emotional or physical damage" was predicated in significant part on evidence of "poverty, inadequate housing, alcohol abuse, [and] non-conforming social behavior." Br. of Appellant KL at 3. Rather, the State presented evidence that KL's continued custody would result in serious emotional or physical damage to LNB-L and ADB-L. Morrigan and Dr. O'Leary specifically testified that continuation of KL's parental relationship would seriously harm the children. Dr. O'Leary explained that KL was belligerent and demeaning and that his unrealistic expectations about his children's development would put his children's safety at risk. Morrigan noted that KL had not addressed his mental health issues, which included a mood disorder, and possibly bipolar disorder. Although there was evidence of KL's affection toward the children, his volatility and angry outbursts at visitations scared the children and led to LNB-L acting out. Substantial evidence supported this finding.

3. Finding XV
¶ 63 Both parents assign error to finding XV, which pertains to 25 U.S.C. § 1912(d) and states:
Active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and these efforts have been unsuccessful. Active efforts included multiple attempts to engage the parents in services, referrals to culturally appropriate services, direct efforts by the Nooksack Tribe to engage the parents in services, transportation assistance, housing assistance, and casework services.
CP at 140, 316.
¶ 64 Substantial evidence supports this finding. As previously discussed, the Department provided the parents with numerous services, including psychological, parenting and substance abuse evaluations, parenting classes, mental health counseling, skills training, financial assistance, a public health nurse, and transportation. Additionally, the Department referred the parents to culturally appropriate mental health services at the parents' request. The Department, in *962 short, complied with section 1912(d)'s "active efforts" requirement.[33]

C. Conclusions of Law
¶ 65 Both JB-L and KL challenge conclusion of law IV, which addresses 25 U.S.C. § 1912(f), and which states "[t]hat it has been overwhelmingly proven beyond a reasonable doubt that continued custody of the child by [JB-L] and [KL] is likely to result in serious emotional or physical damage to the child." CP at 141, 317.
¶ 66 We find that the Department met its high burden of persuasion under ICWA with respect to both parents. After an extensive record review, Dr. O'Leary believed that KL would physically or mentally abuse his children on a daily basis. Morrigan's and Paez's testimony focused on substance abuse, mental health, and domestic violence as likely sources of harm to the children if the parents were to regain custody. Though these issues pertained largely to KL's parental deficiencies, the findings also support the conclusion that JB-L could not adequately parent the children or protect them from KL.

III. Claims Under Chapter 13.34 RCW
¶ 67 Under state law, a juvenile court may terminate parental rights if the State proves the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence, and if termination is in the child's best interests. RCW 13.34.190(1)(a), (2). JB-L and KL argue that termination is not in their children's best interests and that substantial evidence does not support the juvenile court's findings that the State proved three of the six statutory elements of RCW 13.34.180(1)namely, subsections (d), (e) and (f)[34]by clear, cogent, and convincing evidence.
¶ 68 JB-L and KL each assign error to findings of fact VIII, IX, X, and XVI. JB-L separately challenges finding of fact VII. JB-L also asserts that (1) the Department failed to establish that she suffered from "parental deficiencies," (2) the termination statute violates substantive due process, and (3) the Department must prove that termination is in the child's best interests by clear, cogent and convincing evidence, rather than by a preponderance of the evidence. Br. of Appellant JB-L at 51. We reject each of these claims.

A. Findings of Fact

1. Finding VII
¶ 69 JB-L assigns error to finding VII, which states: "The parents have failed to effectively avail themselves of the services ordered pursuant to the aforesaid dependency orders. During the entire time period relevant to these proceedings, the aforementioned services were available if the parents had chosen to avail themselves of such services." CP at 138, 314. JB-L only disputes the first sentence of this finding, arguing that she "complied with the plan and all of the listed services." Br. of Appellant JB-L at 51. Substantial evidence supports this finding as it relates to JB-L's dependent and passive personality traits and her inability to adequately protect the health, safety, and welfare of her children.
¶ 70 JB-L completed all required assessments, including the parenting and substance abuse assessments. JB-L completed her mental health assessmentalbeit a year after she had been ordered to do soand she delayed counseling until February 2008. At the time of trial, JB-L was taking her prescribed liver medication, although she had sometimes been unable to afford her medication. During most of the dependency, she *963 maintained safe and clean housing, although she was homeless at the time of trial. The public health nurse attended JB-L's supervised visits every Thursday for the two years prior to termination. JB-L participated in a four-session independent living skills training workshop. She attended some of the classes in the "Parenting Children who have witnessed Domestic Violence" program, but she did not complete the course. RP at 674.
¶ 71 While JB-L did much of what the Department asked her to do, she was either unwilling or unable to use the services to sufficiently improve her ability to raise and protect her children. The purpose of the services was to assist JB-L to learn to protect the health, safety, and welfare of her children. Morrigan, Paez, and Dr. O'Leary all stated that JB-L, even after receiving extensive counseling and parenting services, could not safely parent her children. Morrigan believed that JB-L did not have the interest, willingness, or ability to make needed changes. Paez noted that "it would be hard for [JB-L] to protect herself and the children from [KL]." RP at 575. Dr. O'Leary concluded that JB-L could not protect her children's safety, even if she separated from KL, and he concluded that she would not benefit from additional services. Therefore, substantial evidence supports the finding that JB-L's availment of the Department's services was not effective because it did not improve her ability to raise and protect her children.

2. Finding VIII
¶ 72 Both JB-L and KL assign error to finding VIII, which addresses the second sentence of RCW 13.34.180(1)(d). The finding states: "All necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been offered or provided. A harm reduction substance abuse program is not a service that is readily or reasonably available and would not be of assistance because father does not believe that his substance abuse issues interfere with his parenting abilities." CP at 138, 314.
¶ 73 Substantial evidence exists that the Department offered both JB-L and KL all necessary services to correct their parental deficiencies. The Department provided JB-L with numerous services, including a psychological evaluation, a parenting evaluation, parenting classes, mental health counseling, in-home independent skills training, housing assistance, and a public health nurse. The Department provided KL with all of these services in addition to substance abuse evaluations and domestic violence counseling. The Department paid for services if reimbursement was not possible and provided the parents free bus and taxi transportation to and from services.
¶ 74 KL argues that a harm reduction treatment program in Bellevue was reasonably available and capable of correcting his parental deficiencies. KL's initial chemical dependency evaluators recommended inpatient treatment and intensive outpatient treatment, but KL was unwilling to use those services. A parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful. In re Dependency of A.M., 106 Wash.App. 123, 136, 22 P.3d 828 (2001) (quoting In re Dependency of P.D., 58 Wash.App. 18, 26, 792 P.2d 159 (1990)). Only after KL failed to access available inpatient or outpatient treatment did he receive a recommendation for harm reduction treatment. Although KL now takes issue with the abstinence-based approaches of the inpatient and outpatient programsgiven his reliance on medical marijuana to treat various medical conditionsit is unclear from the record how long he has relied on medical marijuana for treatment. KL's unwillingness or inability to access the services that the Department offered made providing treatment to him difficult. Furthermore, the Department did not simply ignore KL's request but, instead, it made efforts to locate a State-certified harm reduction program, which it was unable to do. Finally, it is unclear whether the Bellevue program comported with the recommendations of KL's final substance abuse evaluation. Thus, substantial evidence supports the juvenile court's finding that harm reduction treatment was not reasonably available.

*964 3. Finding IX
¶ 75 Both JB-L and KL assign error to finding IX, which addresses RCW 13.34.180(1)(e). The finding states, in relevant part:
There is little likelihood that conditions will be remedied so that the above-named child can be returned to either parent in the near future. With regards to [JB-L], her dependent and passive personality style renders her incapable of protecting herself or her children. She has done nothing to adjust her life throughout the entire dependency. She cannot protect her children and is unable to address their medical needs.
CP at 138, 314.
¶ 76 KL also assigns error to the portion of the finding that reads: With regard to [KL], he has failed to address any of his deficiencies. CP at 138, 314.
¶ 77 Substantial evidence supports the finding that KL failed to address his parental deficiencies, which Morrigan identified as untreated substance abuse, untreated mental health issues, domestic violence and a related criminal history, and an inability to live independently. While KL followed through with some of the provided services and "did well" in the domestic violence program, he ignored the treatment recommendations of multiple substance abuse evaluators, failed to receive treatment for mental health issues, continued to engage in actions resulting in police involvement, took no responsibility for past crimes including domestic violence convictions, and exhibited unrealistic expectations with regard to his children, which put their safety at risk. RP at 922. We uphold this finding.
¶ 78 We also find substantial evidence supporting the finding that JB-L has failed to remedy her parental deficiencies. Morrigan, Dr. O'Leary, and Paez all testified that the children would suffer serious emotional or physical harm if placed with their parents. The three also testified about JBL's passivity and her inability to protect the children, particularly from KL.

4. Finding X
¶ 79 Both JB-L and KL assign error to finding X, which addresses RCW 13.34.180(1)(f), and which states: "Continuance of the parent-child relationship clearly diminishes the child's prospects for integration into a stable and permanent home. This child has never resided with the parents and has been in foster care since he was three days old."[35] CP at 139, 315. KL bases his challenge on the fact that "the parents engaged in and benefited from services." Br. of Appellant KL at 4. But as we explained above, substantial evidence supports findings that the parents did not effectively avail themselves of the Department's services in order to correct their parental deficiencies. KL's argument fails.
¶ 80 JB-L does not appear to challenge the factual basis for this finding but, rather, she argues that the juvenile court misinterpreted the terms "integration" and "relationship" as used in RCW 13.34.180(1)(f). Br. of Appellant JB-L at 35. Because JB-L did not raise this error at trial, we decline to address it for the first time on appeal. RAP 2.5(a). In any case, the challenged language simply reflects the reality that continuing an inadequate parent-child relationship interferes with the creation of a new, stable, and permanent home for the child.

5. Finding XVI
¶ 81 Both JB-L and KL assign error to finding XVI,[36] which addresses RCW 13.34.190(2), and states: "An order terminating all parental rights is in the best interests of the aforesaid minor child." RCW 13.34.190(2) authorizes the juvenile court to enter an order terminating all parental rights *965 only if the court finds that termination is in the child's best interests.
¶ 82 A "best interests of the child" finding depends on the facts and circumstances of each case and a preponderance of the evidence must support it. In re Welfare of Aschauer, 93 Wash.2d 689, 695, 611 P.2d 1245 (1980); see also In re Welfare of A.J.R., 78 Wash.App. 222, 228, 896 P.2d 1298 (1995). We place "very strong reliance" on the juvenile court's determination of what would be in the child's best interests. In re Interest of Pawling, 101 Wash.2d 392, 401, 679 P.2d 916 (1984) (quoting In re Welfare of Todd, 68 Wash.2d 587, 591, 414 P.2d 605 (1966)).
¶ 83 JB-L appears to challenge only the Department's burden of persuasion with regard to the children's best interests; she does not appear to challenge the finding itself. JB-L argues that the juvenile court's "best interests" finding must be supported by clear, cogent and convincing evidence, rather than by a preponderance of the evidence. We exercise our discretion to address this issue even though JB-L did not raise this error in the juvenile court. RAP 2.5(a).
¶ 84 In Santosky v. Kramer, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires states to support allegations of parental unfitness by "at least clear and convincing evidence" before terminating parental rights. 455 U.S. 745, 747-48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Notably, the Santosky Court did not mandate that states use a particular standard of proof when applying a "best interests" test to the issue of termination after the State has proven parental unfitness. Because the Department must support its allegations of parental unfitness by proving each of the six elements of RCW 13.34.180 by clear, cogent, and convincing evidencejust as Santosky requiredWashington's termination statute passes constitutional scrutiny.
¶ 85 KL argues that his bond with his children, in light of ICWA's mandate to preserve the integrity of the Indian family, indicates that termination was not in the children's best interests. However, ICWA's applicability does not mean that ICWA replaces state law with regard to a child's best interests. See Mahaney, 146 Wash.2d at 893, 51 P.3d 776 (discussing ICWA's guidelines in the context of a nonparental custody action). Rather, "[w]ell-established principles for deciding custody matters should further [ICWA's] goals." Mahaney, 146 Wash.2d at 893, 51 P.3d 776.
¶ 86 Although KL appeared bonded to the children, he also acted emotionally volatile, angry, and inappropriate during visits with his children, to the point that he scared them. KL failed to engage in required chemical dependency services, continuously blamed JB-L for the children being taken, and, over the two years of dependency, either made no progress in correcting his parenting deficiencies or made further declines in his parenting abilities. Morrigan, Paez, and the GAL testified that the children's best interests warranted termination of KL's parent-child relationship. In light of these facts and circumstances, substantial evidence supports the juvenile court's finding that termination was in the children's best interests.

B. Substantive Due Process
¶ 87 JB-L argues that Washington's termination statute violates substantive due process by interfering with her fundamental liberty interests as a parent. She concedes the State's interest in preventing harm to children, but she argues that the statute is unconstitutional because it does not require the juvenile court to reject all less restrictive alternativessuch as a temporary continuation of the dependency, dependency guardianship, third-party custody, return home or open adoptionbefore terminating parental rights. We reject these arguments.
¶ 88 We review a challenge to a statute's constitutionality de novo. In re Parentage of C.A.M.A., 154 Wash.2d 52, 57, 109 P.3d 405 (2005). A statute is presumed constitutional, and the party challenging it has the burden of proving beyond a reasonable doubt that it is unconstitutional. In re *966 Det. of C.W., 147 Wash.2d 259, 277, 53 P.3d 979 (2002).
¶ 89 A parent has a fundamental liberty interest in the care and custody of her children. In re Dependency of J.H., 117 Wash.2d 460, 473, 815 P.2d 1380 (1991). The State may only interfere with this interest if it "has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved." C.A.M.A., 154 Wash.2d at 57, 109 P.3d 405 (quoting In re Custody of Smith, 137 Wash.2d 1, 13, 15, 969 P.2d 21 (1998)). The "best interest of the child" standard is not a compelling state interest that overrules a parent's fundamental right to raise her children. Smith, 137 Wash.2d at 20, 969 P.2d 21. The State may only interfere with a parent's protected right to raise her children where the State seeks to prevent harm or risk of harm to the child. Smith, 137 Wash.2d at 18, 969 P.2d 21.
¶ 90 Every division of this court has rejected similar arguments that the termination statute violates a parent's fundamental liberty interest in the care and custody of her children. In re Welfare of M.R.H., 145 Wash.App. 10, 31, 188 P.3d 510 (2008), review denied, 165 Wash.2d 1009, 198 P.3d 512 (2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1682, 173 L.Ed.2d 1046 (2009); In re Dependency of T.C.C.B., 138 Wash.App. 791, 798-99, 158 P.3d 1251 (2007); C.B., 134 Wash.App. at 346, 139 P.3d 1119; In re Dependency of I.J.S., 128 Wash.App. 108, 118, 120, 114 P.3d 1215 (2005). This court's rationale in I.J.S. is representative: "the termination statutes are narrowly drawn because the State must prove that the relationship with the parents harms or potentially harms the child before the court can terminate parental rights."[37]I.J.S., 128 Wash. App. at 118, 114 P.3d 1215; accord M.R.H., 145 Wash.App. at 31, 188 P.3d 510; C.B. 134 Wash.App. at 345, 139 P.3d 1119. JB-L asks us to reconsider these decisions based on her novel statutory argument with regard to finding X which, as we noted above, she failed to preserve. We decline to do so.
¶ 91 We affirm the juvenile court's termination orders because substantial evidence supports the juvenile court's findings. These findings in turn support the juvenile court's conclusions that the parents' continued custody of LNB-L and ADB-L would result in serious emotional or physical damage to them such that termination is in the children's best interests. We remand to the juvenile court so that the Department may notify the Cherokee and Black Foot tribes of the termination proceedings. If either of these tribes chooses to become involved, the juvenile court shall hold further proceedings consistent with this decision. If neither of these tribes chooses to become involved, the termination orders will stand.
We concur: VAN DEREN, J., and HOUGHTON, J.P.T.
NOTES
[1] We refer to the children and their parents by their initials in order to protect the children's anonymity.
[2] ICWA is codified at 25 U.S.C. §§ 1901-1963. LNB-L and ADB-L each qualify as an "Indian child" under 25 U.S.C. § 1903(4) because LNB-L is an enrolled member of the Nooksack Tribe and ADB-L is eligible for enrollment as a member in the Nooksack Tribe.
[3] After the termination proceedings in this case, the legislature amended RCW 13.34.180 in a manner that does not impact our analysis. See Laws of 2009, ch. 520, § 34; Laws of 2009, ch. 475, § 5. For ease of reference, we cite to the current version of the statute throughout this opinion.
[4] LNB-L had lost about ten percent of his birth weight. After placement in foster care, LNB-L began gaining weight.
[5] The Department had received reports that KL used excessive amounts of alcohol in addition to marijuana, methamphetamine, and cocaine.
[6] JB-L participated in the same program while pregnant with LNB-L, but the University removed her from the program because she missed too many appointments.
[7] At oral argument, and again in her amended supplemental brief, JB-L asserted that the Squamish Nation and the Squamish Indian Tribe of the Port Madison Reservation, a federally recognized tribe, are related or affiliated in some way. See 74 Fed.Reg. 40218, 40221 (Aug. 11, 2009). Despite the similarity in spelling, nothing in the record supports JB-L's contention that the tribes are related or affiliated.
[8] Because the record is unclear on this point, we refer to the tribe as the "Black Foot" tribe throughout in keeping with KL's description.
[9] The Nooksack Tribe formally intervened in the dependency of ADB-L on February 22, 2007, and the tribe's counsel appeared telephonically at ADB-L's dependency hearings.
[10] At the time of trial, LNB-L and ADB-L were placed together with Native American foster parents.
[11] The date that KL received his medical marijuana license is unclear. On October 30, 2008, he testified that he started taking medical marijuana "two years ago," but he later testified that he completed a drug and alcohol evaluation at Right Choice Counseling before he received the license. RP at 199. According to Morrigan, KL attended the Right Choice evaluation on August 22, 2007. The record contains a medical authorization, signed by a physician, allowing KL to possess marijuana for medical purposes from August 29, 2008 to August 29, 2009.
[12] Clinical psychologist Dr. Michael O'Leary testified that a "harm-reduction program" focuses on reducing the negative effects of an intoxicant through "self-control training, intoxication discrimination training, [and] other means of helping a person either reduce the frequency or the amount used per occasion." RP at 310.
[13] When asked if he was familiar with a harm-reduction model, NeSmith replied that he only had a "layman's understanding" and that he was "not a substance abuse expert." RP at 1092.
[14] North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).
[15] KL's criminal history also includes two convictions for possession of illegal drugs. KL denied possessing drugs in either case.
[16] Guardian Ad Litem (GAL) Jennifer Martin testified that LNB-L's behavior worsened after he changed foster homes but that, three weeks after contact with his prior foster care provider ended, LNB-L's aggression occurred only on days surrounding his visits with KL and JB-L.
[17] The Department required JB-L to take a class on protecting children who witness domestic violence, but the provider cancelled the class before JB-L could complete it.
[18] Paez explained that the children have "numerous medical problems," including asthma. RP at 575.
[19] Prior to the admission of the tribal resolution into evidence, KL objected to Paez's testimony that the Nooksack had designated her as an expert. The juvenile court stated: "Well, I will permit her to testify about what her understanding of her certifications are, but reserve ruling on the issue of whether she is qualified as an expert under ICWA." RP at 565. Later, after the court reviewed the tribal resolution, the court stated, "I'm satisfied that it's within Ms. Paez's appointment as an expert to testify with respect to the tribe's conclusions concerning the placement and the future of the children." RP at 573.
[20] As we noted, there is insufficient evidence in the record to demonstrate that the "Black Foot out of the Algonquin Nation" refers to the federally-recognized Blackfeet Tribe of the Blackfeet Indian Reservation of Montana. RP at 538. Because the identity of this tribe is not clear from the record, the Department should, on remand, notify the Portland Area Director of the Bureau of Indian Affairs (BIA) of the termination orders in the manner prescribed by 25 C.F.R. § 23.11. See RCW 13.34.070(10)(a). If the BIA cannot identify this tribe, or if this tribe, as well as the Cherokee, declines to intervene, the termination orders will stand.
[21] Congress enacted ICWA to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." 25 U.S.C. § 1902. Notice ensures that a tribe will be afforded the opportunity to assert its rights under ICWA. In re Welfare of M.S.S., 86 Wash.App. 127, 134, 936 P.2d 36 (1997) (citing In re Kahlen W., 233 Cal.App.3d 1414, 285 Cal.Rptr. 507, 511 (1991)). Under ICWA, the Indian child's tribe may intervene at any point in termination proceedings involving the child in state court. 25 U.S.C. § 1911(c). The Indian child's tribe may also request transfer of the termination proceedings to tribal court. 25 U.S.C. § 1911(b).
[22] Participating Judge Houghton's last day with the court is Friday, July 30, 2010, leaving us without time to solicit and obtain a response to the Department's motion for reconsideration.
[23] RCW 13.34.065(4)(h) also requires the juvenile court, at the shelter care hearing, to inquire into "whether the provisions of [ICWA] apply, and whether there is compliance with [ICWA], including notice to the child's tribe."
[24] The legislature recently added another reference to ICWA's definition of "Indian child:"

The court may not order an Indian child, as defined in 25 U.S.C. Sec. 1903, to be removed from his or her home unless the court finds, by clear and convincing evidence including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
RCW 13.34.130(1)(b); Laws of 2010, ch. 288, § 1.
[25] We note that our legislature's 2004 amendment, which directs a petitioning party to notify all of the tribes affiliated with an Indian child, is consistent with the Bureau of Indian Affairs's (BIA) non-binding guidelines for state courts in Indian child custody proceedings. Subsection (b) of guideline B.5 states, "In any involuntary Indian child custody proceeding, notice of the proceeding shall be sent to ... any tribes that may be the Indian child's tribe." Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed.Reg. at 67584, 67588 (Nov. 26, 1979).
[26] JB-L and KL each assign error to conclusion of law III, which states the Department's burden of persuasion: "all the allegations contained in the termination petition, as provided in RCW 13.34.180(1)(a) through (f), have been established by clear, cogent and convincing evidence." Clerk's Papers (CP) at 141, 317. As the standard of review articulated in K.S.C. makes clear, we inherently review whether the Department met its burden of persuasion as part of our review of the juvenile court's findings. 137 Wash.2d at 925, 976 P.2d 113. Accordingly, we do not separately address the parents' challenge to conclusion of law III.
[27] Many of the juvenile court's findings are actually mixed findings of fact and conclusions of law. Because "a conclusion of law is a conclusion of law wherever it appears," we review the conclusions of law in such mixed findings de novo. Robel v. Roundup Corp., 148 Wash.2d 35, 43, 59 P.3d 611 (2002) (quoting Kane v. Klos, 50 Wash.2d 778, 788, 314 P.2d 672 (1957)). We review the factual aspects of such mixed findings for substantial evidence. See K.S.C., 137 Wash.2d at 925, 976 P.2d 113.
[28] The trial court entered separate findings of fact and conclusions of law for each child. Because the findings and conclusions are nearly identical, we refer to them in the singular.
[29] KL also argues, correctly in our view, that Dr. O'Leary probably should not be considered a qualified expert under ICWA. The record indicates merely that Dr. O'Leary had performed "a number" of evaluations of Indian parents and had written articles about alcohol abuse in Native American communities. RP at 333.
[30] While these guidelines do not have "binding legislative effect," we have relied on them for guidance. See, e.g., In re Dependency of T.L.G., 126 Wash.App. 181, 188 n. 10, 108 P.3d 156 (2005) (quoting 44 Fed.Reg. 67584).
[31] KL cites two cases to support his view that a qualified expert witness must be familiar with the child-rearing practices of a particular tribe. One case clearly does not support KL's assertion, stating, "[w]e do not hold that an expert ICWA witness qualified under subpart three of the Guidelines must be fluent in the cultural standards of a particular Indian tribe." In re Matter of K.H., 294 Mont. 466, 981 P.2d 1190, 1197 (1999). The other case supports KL's argument but Washington courts have not adopted it. See People ex. rel. M.H., 691 N.W.2d 622, 627 n. 6 (S.D.2005) (stating "it is not too much to require an ICWA expert to be familiar with the child's tribe.").
[32] 70 Or.App. 10, 688 P.2d 1354 (1984).
[33] As Division One of this court has noted, the remedial services requirements of RCW 13.34.180(1)(d) and (e) "place[ ] a more strenuous burden on the State than does § 1912(d)." In re Dependency of A.M., 106 Wash.App. 123, 134, 22 P.3d 828 (2001). As we discuss later in this opinion, substantial evidence also supports the findings that establish the elements of RCW 13.34.180(1)(d) and (e).
[34] JB-L and KL do not assign error to findings of fact IV and V, which establish each of the elements of RCW 13.34.180(1)(a), (b) and (c). Nor do they assign error to finding of fact VI, which establishes the elements in the first clause of RCW 13.34.180(1)(d) that "services ordered under RCW 13.34.136 have been expressly and understandably offered or provided." As discussed later, both JB-L and KL assign error to finding of fact VIII, which pertains to the second clause of RCW 13.34.180(1)(d).
[35] LNB-L was three weeksnot three daysold when the Department removed him from his parents' custody. Thus, substantial evidence does not support this portion of the finding with regard to LNB-L.
[36] JB-L and KL each assign error to conclusion of law II, which states that termination would be in the children's best interests. We address the parents' challenge to both finding XVI and to conclusion of law II in this section.
[37] Proof of harm or risk of harm is implicit in RCW 13.34.180(1) because subsection (a) requires the State to show that the child is "dependent," meaning that the child has been abandoned, abused, neglected, or finds himself in circumstances that constitute a danger of substantial damage to his physical or psychological development. C.B., 134 Wash.App. at 345, 139 P.3d 1119.