# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| In the Matter of the Adoption of: T.A.W., | No.  52684-1-II |
| R.B. and C.B., | |
| Petitioners, | |
| v. | UNPUBLISHED OPINION |
| C.W., | |
| Respondent. | |

SUTTON, J. — CW, the biological father of TAW, an Indian[1] child, appeals from the trial court order terminating CW's parental rights and granting TAW's stepfather's adoption petition under the Indian Child Welfare Act (ICWA)[2] and the Washington State Indian Child Welfare Act (WICWA).[3]  CW argues that (1) the trial court improperly concluded that there had been "active efforts" to provide him with remedial services and rehabilitative programs designed to prevent the breakup of the Indian family as required under ICWA and WICWA, (2) the trial court erred when

---

[1] "With the understanding that 'Indian' may not be preferred when referencing Native Americans, American Indians, indigenous peoples, or First Nations, we use the term throughout this opinion only because it is the expression adopted by both [the Indian Child Welfare Act] and [the Washington State Indian Child Welfare Act].  We intend no disrespect." *In re Adoption of T.A.W.*, 186 Wn.2d 828, 834 n.1, 383 P.3d 492 (2016).

[2] 25 U.S.C. §§ 1901-1963.

[3] Ch. 13.38 RCW.

it found that the guardian ad litem (GAL) was qualified as an expert witness under ICWA based on its erroneous finding that the GAL had over 30 years of experience as a GAL,  and (3) the trial court erred in concluding that continuing CW's parental rights would likely result in serious emotional or physical damage to TAW.

We hold that although facilitating visitation can be a remedial service, it was not reasonably available under the circumstances after September 2012.  Thus, CW does not show that the trial court erred when it concluded that CB and RB had proved they had made active efforts to provide CW with remedial services and rehabilitative programs designed to prevent the breakup of the Indian family as required under ICWA.  We further hold that CW waived his argument challenging the GAL's qualifications as a qualified expert witness and that, in light of this holding, any error in the trial court's finding that the GAL had 30 years of experience is harmless.  Finally, we hold that the trial court's findings support its conclusion that continuing CW's parental rights would likely result in serious emotional or physical damage to TAW.  Accordingly, we affirm.

FACTS

I. BACKGROUND AND CHRONOLOGICAL HISTORY[4]

CB and her son TAW are enrolled members of the Shoalwater Bay Indian Tribe (Tribe). CW is not an enrolled member of any recognized Indian band or tribe nor is he eligible for such enrollment.

---

[4] Unless otherwise noted, these facts are based on the trial court's unchallenged findings of fact, which are verities on appeal. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010).  These facts also include portions of the findings of fact challenged by CW to the extent CW does not present any argument related to those portions of the challenged findings of fact, which are also verities on appeal. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

CB and CW began their relationship in 2004, married in 2007, and divorced in September 2009. CB married RB, TAW's stepfather, in 2013.

A. 2004 THROUGH 2009 EVENTS

TAW was born to CB and CW in December 2007. When TAW was a few months old, the family moved to Tokeland, which is located within tribal jurisdiction. For the next month and a half, CW cared for TAW on the days CB worked in Longview. Starting in December 2008, CW started selling drugs.

From March 11, 2009 through April 1, 2009, CW received inpatient drug and alcohol treatment. During this treatment, CW and CB attended family counseling in an attempt to preserve the family. CB provided CW with transportation so he could attend treatment. At CB's request, the Tribe paid for CW's drug treatment and family counseling.

Upon CW's release from the treatment facility, CB allowed CW to return home. Kathirine Horne, the director of Shoalwater Bay Tribal Social Services, established a case plan for intensive outpatient treatment for CW, which had been recommended by the treatment facility. Although the Tribe was willing to pay for CW's aftercare treatment and to provide transportation, CW rejected this treatment.

Thirteen days after the end of his inpatient treatment, CW left for Mount Rainier with a friend who had offered him (CW) employment. CB gave CW permission to take her vehicle and cash card. When the employment did not materialize, CW relapsed into drug use off and on until 2017.

When CW failed to return from Mount Rainier, CB posted flyers attempting to locate him. Horne located CW and offered to take him to another drug treatment facility at the Tribe's expense. CW refused this offer.

On April 20, 2009, CW had his last face to face contact with TAW. That same day, CW assaulted CB. Around this time, CW moved out of the family home.

On April 22, CW committed felony attempt to elude; he was charged with this offense on April 24. On April 23, CB obtained a temporary protection order. On May 1, a temporary restraining order[5] "restricting visitation" between CW and TAW was entered. Clerk's Papers (CP) at 47 (Finding of Fact (FF) A 21).

Soon after obtaining the May temporary restraining order, CB filed for dissolution of the marriage. On CB's motion, the superior court terminated the temporary order or orders[6] because CW was again in drug treatment.

In June 2009, CB and CW reconciled. The marriage failed again in July.

Meanwhile, on June 29, CW pleaded guilty to a violation of a domestic violence court order; he entered the drug court program on or around August 23. The drug court ordered CW to complete inpatient and intensive outpatient treatment. In early September, CW entered an inpatient and outpatient treatment program that was paid through the drug court program.

---

[5] The trial court's written findings of fact use the terms "protection order" and "restraining order" interchangeably. Because these facts are based on the trial court's written findings of fact, we do as well.

[6] The trial court's finding of fact does not state whether this motion related to only one of the previously issued orders or to both.

During this time, the dissolution proceeded. A September 23, 2009 parenting plan allowed CW to have supervised visitation with TAW at Reunion Outreach during CW's drug treatment if he provided proof of three months of clean urinalysis tests and stable housing. CW did not exercise his visitation with TAW.

B. 2010 THROUGH 2011 EVENTS

On January 1, 2010, while still under drug court supervision, CW was charged with possession of heroin with intent to deliver. His drug court agreement was terminated in February 2010, and he pleaded guilty to the underlying felony eluding charge.

In March, CW pleaded guilty to the January 2010 drug charge and received a drug offender sentencing alternative (DOSA)[7] sentence, which required drug treatment. CW started inpatient treatment that was paid for by the Department of Corrections (DOC). In May or June, CW was discharged from the program "apparently due to seizure or illness." CP at 48 (FF 32).

Meanwhile, between April and May 2010, CW committed several more offenses including second degree burglary, residential burglary, possession of a stolen vehicle, and theft of a motor vehicle. He pleaded guilty to these offenses and was sentenced to prison. Soon after CW's incarceration, on CB's motion, the May 1, 2009 protection order prohibiting contact with TAW was terminated.

While CW was in prison in 2011, CB contacted CW by phone and letter and allowed TAW to be involved in these communications. CB also sent CW a book of photographs of TAW. But CB refused CW's requests to allow TAW to visit him in person.

---

[7] RCW 9.94A.660.

C.  2012 THROUGH 2018 EVENTS

CW was released from prison in September 2012.  On September 12, CB obtained a domestic violence protection order from the Tribal court.  This protection order prohibited CW from contacting CB or TAW or entering reservation property for any reason other than to attend court hearings.

In October, CW obtained an order modifying the September 12, 2012 protection order to allow him to petition for a rehearing if he completed at least six months of domestic violence classes or programs.  The Tribe offered CW further services upon request.  Despite being aware that the Tribe would pay for services and that domestic violence classes were available locally, CW never attended any domestic violence classes or programs.[8]

In January 2013, within four months of his September 2012 release, CW committed a second degree robbery.  He pleaded guilty to this charge in April 2013, and was sentenced to 43 months of confinement followed by 18 months of community custody.

In June, CB and RB petitioned to terminate CW's parental rights and to allow RB to adopt TAW.  These proceedings are described in more detail below.

CW was released from prison on September 6, 2015.  On October 14, CB obtained another domestic violence protection order from the Tribal court prohibiting contact between CB and TAW.  This order did not contain any purging conditions and expired on October 14, 2018.  From October 2015 through March 2016, CW "received intensive outpatient treatment . . . with services paid by the [DOC]."  CP at 53 (FF B9(g)).

---

[8] CW assigns error to this factual finding, but he presents no relevant argument.  Accordingly, we consider this finding a verity on appeal.  *L.N.B.-L.*, 157 Wn. App. at 243.

In April and May 2016, CW was charged with additional offenses. In June, he pleaded guilty to taking a motor vehicle without permission and was sentenced to 29 months in confinement. In November, CW pleaded guilty to second degree robbery and two counts of theft of a motor vehicle and was sentenced to 72 months in confinement to run consecutive to his 29-month sentence on the taking a motor vehicle without permission conviction. In June 2018, the DOC classified CW "as a High-Risk Violent Offender" and a "High-Risk Property Offender," which means there is a high risk when CW is released, he will commit another violent or property crime. CP at 52 (FFs A58-A59).

## II. TERMINATION/ADOPTION PETITION, TRIAL COURT'S INITIAL DECISION, AND FIRST APPEAL

In June 2013, CB and RB petitioned to terminate CW's parental rights and to allow RB to adopt TAW. Following a trial, the trial court granted the petition. *In re Adoption of T.A.W.* (*T.A.W. I*), 188 Wn. App. 799, 805, 354 P.3d 46 (2015), *aff'd*, 186 Wn.2d 828, 383 P.3d 492 (2016) (*T.A.W. II*).

CW appealed and our Supreme Court held that (1) ICWA and WICWA apply to the termination of parental rights of a non-Indian biological parent of an Indian child, (2) ICWA and WICWA apply to stepparent adoptions of Indian children, (3) ICWA and WICWA's active efforts provisions apply to privately initiated terminations when the Indian child will remain with the Indian parent, and (4) "WICWA does not contain an abandonment exception." *T.A.W.* II, 186 Wn.2d at 847, 850-51, 852, 861-62. Our Supreme Court remanded this case back to the trial court to reconsider the "termination petition" in light of its holdings. *T.A.W.* II, 186 Wn.2d at 862.

### III. PROCEEDINGS ON REMAND

A new trial was held on June 13 and 14, 2018. Evidence of CW's criminal and treatment history and interactions with CB and TAW were presented at trial as described above.[9]

A. EVIDENCE

GAL Keith Lawrence testified at trial. CW did not object to Lawrence's testimony on the grounds that he was not a qualified expert witness under ICWA.

Lawrence testified that he had a psychology degree and a 47-year history in criminal justice and social service. He also described his extensive experience as a case worker with the Department of Social and Health Services (DSHS) and Child Protective Services (CPS) and as a juvenile probation officer. Lawrence stated that he had done home studies for adoptions for "about forty years" and he had been on the GAL register for a year. 1 Report of Proceedings (RP) at 58. Lawrence estimated that he had completed about 30 GAL reports in that year. As to his experience with ICWA, Lawrence stated that he had worked on one ICWA dependency case when he was working with CPS and that he had not been involved in any ICWA adoption cases.

Horne testified that the Tribe supported the adoption. She also testified that because of CW's relationship to TAW, the Tribe continued to offer services to CW and that it would continue to offer services to CW even if his parental rights were terminated.

---

[9] CW does not challenge the findings of fact described above, so they are verities on appeal. *L.N.B.-L.*, 157 Wn. App. at 243.

No. 52684-1-II

B. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial court terminated CW's parental rights and granted the adoption petition. In

support of these decisions, the trial court issued 26 pages of written findings of fact and conclusions

of law.

In addition to the facts set out above, the trial court issued the following written findings

of fact:

> 4) . . . . As a result of [his numerous] criminal convictions [between 2010 and 2016, CW] has served most of the last 8 years in custody and remains in custody until October of 2020.
>
> 5) **2005 to 2009** - Between 2005 and 2009, [CW] assaulted [CB] five times.
>
> . . . .
>
> 10) **April 2009 to June 2018** - [CW] continued in drug use, was often incarcerated, and was by his own admission addicted to methamphetamine. CW was convicted of eleven felonies between 2010 and 2016. At the time of trial, he remained incarcerated with a release date scheduled for October 2020.
>
> 11) **April 2009 to June 2013** - Between April 2009 and June 2013, any contact between the CW and child was initiated solely by [CB] or the [CW's] mother, and not by any effort of [CW].
>
> . . . .
>
> 13) **April 2009** - After late April 2009, CW had not contacted nor made any attempted contact with TAW, nor sought [c]ourt assistance to have such contact.
>
> 14) **April 2009 to June 13, 2013** - Between April 2009 and June 13, 2013, [CB] under the circumstances made a good faith and consistent effort to establish and maintain a relationship between [CW] and the child, and this effort was rejected by [CW].
>
> . . . .
>
> 19) The Shoalwater Bay Indian Tribe received actual notice of these proceedings and approved of [CB's] efforts in this action.

CP at 53-55 (FF B) (citations to exhibits and record omitted).

9

The trial court also made additional findings related to the "'active efforts'" on behalf of CB, RB, and others. CP at 55. In addition to the facts set out above, the trial court's findings included the following:

- At trial, Horne stated that CW was considered part of the Tribe family and the Tribe was willing to offer him services if he requested them, just as the Tribe would have if he had been a tribal member. (FF C9).

- Supervised visits with TAW were available as of May 1, 2009, but they did not happen because CW's mother declined to supervise the visits out of concern "that she was aiding and abetting violations of other restraining orders." CP at 57 (FF C10).

- Horne contacted CW in prison between October 2010 and September 2012, to inform him that the Tribe would be willing to help with services, including drug treatment and domestic violence classes, upon his release and would continue to offer him services even though he was no longer married to CB. (FFs C22-C24). But CW never took advantage of this offer. (FF C24).[10]

- Horne contacted CW when he was served with the Tribal no-contact order to offer help. (FF C22).

The trial court concluded "that the active efforts described [in its findings were] more than sufficient to meet the requirements of the statute. RCW 13.38.130[.]"[11] CP at 60 (FF C). The trial court stated,

---

[10] CW assigns error to the trial court's findings of fact C23 and C24, but he presents no argument relevant to these portions of those findings, so we consider them verities on appeal. *L.N.B.-L.*, 157 Wn. App. at 243.

[11] Although the conclusion was part of a finding of fact, it is more properly characterized as a conclusion of law. *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 871, 439 P.3d 694 (2019) (we review conclusions of law erroneously characterized as findings of fact as conclusions of law); *Casterline v. Roberts*, 168 Wn. App. 376, 382-83, 284 P.3d 743 (2012) (determinations made by a process of legal reasoning from the facts in evidence are conclusions of law).

In the present case, [CB] sought to address [CW's] drug problem by encouraging the Tribe to pay for his treatment for drug addiction, which they did on one occasion. The Tribe repeatedly made it clear to [CW] that they would continue to provide treatment if he desired. [CW] clearly chose drugs over his child every single time between 2009 and 2018, and during that time, there were at least four attempts at treatment.

All during that time, *up until 2012, [CB] sought to maintain the relationship between [CW] and the child.* It is true she sought restraining orders against him, but she also repeatedly asked that those restraining orders be lifted so he could have a relationship with his child. It is a fine line of survival that an abused woman walks balancing her perception of what it takes to stay alive and giving her child the opportunity to know his father. It is easy to "Monday morning quarterback" her decisions, but in this case considering the intransigent nature of [CW's] addiction decisions, she more than met the requirements of the statute. On at least one occasion, she sent photographs of the child to [CW] in prison and allowed telephone communications. She attempted to allow visitation through [CW's] mother, even though a restraining order existed forbidding that contact. That that contact did not occur, or occurred only one or two times, was the result of [CW's] mother's worry that she was aiding and abetting a violation of the restraining order. [CB] here was clearly attempting to allow a relationship yet keep herself safe by utilizing the services [CW's] mother.

*It was only in 2012, after [CW] had committed four felonies (2 in Pacific County and 2 in Grays Harbor County) and after the last domestic violence incident that [CB] did not pursue efforts to maintain the father-son relationship. On the other hand, other than obtaining a restraining order to protect herself from his assaults, she did not do anything to interfere with the efforts by [CW] to seek a relationship.* He just never did. After 2009, he never contacted her about visitation; he never went to court to obtain visitation except to modify the restraining order to get the possibility of contact, if he completed domestic violence perpetrator education and treatment (which he never pursued); and he never provided financial support.

*[CB's] attempts to maintain the father-son relationship between 2008 [and] 2012, the Tribe's efforts and offers to provide treatment for drug addiction between 2008 and 2012, and the criminal justice system's provision of treatment opportunities between 2012 and 2017, through drug court, and pursuant to the DOSA sentencing alternative requiring inpatient and aftercare, more than meet the statute's requirement of "active efforts".*

> *The only arguable ingredient of "active efforts" missing in the history of the relationship of [CB], [CW] and son, is visitation. But visitation is not one of the requirements under the statute[.]* "*In re Dependency of T.H.*[12] holds that that visitation is not a service that the [DSHS] is required to provide under RCW 13.34.180(1)(d). [] The [c]ourt noted that the term "services" required under RCW 13.34.136, includes domestic violence counseling, parenting classes, drug and alcohol counseling, random urinalysis, and other similar services. [] Each of these activities is a means of curing parental deficiencies, whereas visitation itself provides no such rehabilitation. The [c]ourt went on to explain that RCW 13.34.136, clearly differentiates between services and visitation, and prohibits a dependency court from limiting visitation as a sanction for a parent's failure to comply with services. [] *Both of these circumstances imply that visitation is not itself considered a service.*" *In re the [M]atter of S.B.-L.*, [noted at] 183 Wn. App. 1008[, 2014 WL 4198289]).

CP 60-61 (FF C) (emphasis added).

The trial court also discussed the effect of the existence of the Tribal [c]ourt restraining order and CW's incarcerations on CB and RB's "active efforts" to maintain TAW's relationship with CW. The trial court concluded,

> In the present case, this [c]ourt must give full and complete effect to the Tribal Court [r]estraining [o]rder against [CW]. This [c]ourt cannot order [CB] to foster a relationship between the [c]hild and [CW] that the Tribe forbids. This [c]ourt cannot make some finding that "active efforts" should have included some sort of relationship forged around the absence of contact. No such relationship would fulfill the intent of the [s]tatute to maintain Tribal integrity.
>
> Finally, between 2010 and 2018 [CW] spent almost 7 years in prison. The need for any drug treatment resulting in a fit-father could not have been accomplished in the brief stints of freedom between incarcerations. Even if it could be argued that more services should have been offered, [CW] could not have accepted these services since he kept returning to prison. Offering services in the face of the Tribal [o]rder, the real danger presented by [CW] to [CB's] health and safety, and the constant return to incarceration by [CW] would have made the offer, or provision, of additional services futile beyond a reasonable doubt.

CP at 62-63.

---

[12] *In re Dependency of T.H.*, 139 Wn. App. 784, 162 P.3d 1141 (2007).

The trial court then addressed Lawrence's testimony. The trial court stated,

> [CB] called Mr. Lawrence to fulfill the obligation required of the statute. Mr. Lawrence is not a member of the Shoalwater Bay Tribe, does not have substantial experience in delivering child and family services to Indians, does not have extensive experience with delivery of services to any other tribe, he is however a professional person having substantial education and experience in the area of his or her specialty which is *as a [GAL] for children for over 30 years*.

CP at 63 (emphasis added) (internal quotation marks omitted). The trial court concluded that Lawrence's lack of specialized knowledge of the social and cultural aspects of Indian life did not disqualify him as a qualified witness because this case did not involve any culturally sensitive issues.

Quoting extensively from Lawrence's report, the trial court then further discussed Lawrence's testimony about CW and the potential consequences of CW maintaining a relationship with TAW:

> Mr. Lawrence testified unequivocally to the likelihood of harm to [TAW] if [CW] were allowed contact:

> And what I have seen like when I was at Green Hill School and also looking at the guys in Longview Work Release, is that when an individual is in prison they're told when to get up, what they're going to do for day, what they're going to eat, when they're going to go to bed. They never really truly have to exercise any decision-making skills. And so, what happens is you end up with a 40 or 45 year old man, who functions like a 13 or 14 year old emotionally. And they become very ah, they're self-centered, ah, they don't plan things well, and that's one of the reasons they get caught so easily.

> Now, his release date or earliest release date is October 20, 2020. [TAW] is now 10; by 2020, he will be 12. In [TAW's] development he is just starting to get through this security and love stage. He has a stable home, his mother, his stepdad, both love him. They provide a secure home for him, and it's a stable home life.

> By the time he gets to be 12, he's going to be moving into dealing with his social needs, and he's going to be, his friends are going to become a lot more important to him than his parents. And so, what happens is if [CW] comes out of prison in a

couple years, and starts trying to visit with [TAW], you're going to have one teenager basically interacting with another. And [CW] hasn't shown, from my understanding of his record, that he can remain clean and sober or remain out of trouble with the law, when he's not in a very structured setting.

And my concern is that if [CW] tries to start renewing a relationship with [TAW], is that [TAW] will be ultimately disappointed because [CW] will either get high again or get into trouble again. And he's going to start missing appointments to visit. And [TAW], at his state of development, [TAW] is going to start internalizing some of that, that he feels that it maybe was his fault. **And I see that as being very destructive** . . . , and when he's trying to visit his biological father, that [CW] can be there on a regular basis.

CP at 63-64 (quoting 1 RP at 76-78) (emphasis added by trial court). The trial court also acknowledged that Horne was an expert witness and that Horne testified that the Tribe was aware of and supported the proposed adoption.

Ultimately, the trial court concluded that the evidence established beyond a reasonable doubt that maintaining "contact" between CW and TAW "would likely result in serious emotional or physical damage to the child." CP at 65 (FF E). The trial court stated,

> *The evidence is sufficient for the [c]ourt to find beyond a reasonable doubt, that contact by the child at issue, TAW, with [CW] would likely result in serious emotional or physical damage to the child.* As indicated above, [CW] is impulsive and remains addicted to methamphetamine/heroin. He has an extensive criminal record and is likely to commit property crimes if released. The child has seen [RB] as his father for over six years. The fact that [CW] has an addiction to narcotics and has a long history of committing criminal acts impulsively and has abandoned the child for the past seven years, leads to the conclusion beyond a reasonable doubt that actual harm to the child would occur if the child was allowed to have contact with [CW].
>
> . . . .
>
> Likewise, Mr. Lawrence testified, and provided in his [r]eport, that [CW] has engaged in significant domestic violence toward the child's mother and has not been treated for this condition.

Untreated domestic violence tendencies, which could lead to violence [in] the presence of the child, is a basis for determining that contact with the child here would likely result in serious or physical harm to the child.

CP at 65 (citations omitted).

The trial court also entered the following findings related to CW:

1.  [CW] is not a fit parent because he has failed to perform parental duties under circumstances showing a substantial lack of regard for his parental obligations. (RCW 26.33.120)  Since 2009, [CW] has not expressed love and affection for the child, has not expressed personal concern over the health education and general well-being of the child, has failed to provide necessary food clothing and medical care or the means to obtain the same, has not provided adequate domicile, and has failed to furnish social or religious guidance. *In [re] Adoption of Lybbert*, 75 Wn.2d 671[,453 P.2d 650] (1969).

2.  Pursuant to RCW 26.32.040(4), [CW] has *abandoned* the child herein under circumstances showing a willful substantial lack of regard for parental functions

3.  While in prison, [CW] made no serious efforts to locate his son or attempt to establish contact.  Even if it could be said that he had made some efforts, which the [c]ourt does not find, whenever he encountered resistance or obstacles he never demonstrated sincere interest in retaining his parental rights.  [*In re Interest of Skinner*, 97 Wn. App. 108, 122, 982 P.2d 670 (1999)].

CP at 65-66 (FF F) (emphasis added).  The trial court also found that the adoption was in TAW's

best interests.[13]

---

[13] The trial court's conclusion stated,

[T]he [c]ourt finds beyond a reasonable doubt that [it] is in the best interests of the child, TAW, to be adopted by the Petitioner, [RB].  Considering the physical and mental condition of the child, as testified to by [RB] and [CB], the home environment family life, the health of the parties, the facilities available to the child, and the resources of [CB and RB], and also including the consideration of the cultural heritage of both the mother and the child as Native Americans, there can be no doubt that the best interests of [t]he child, TAW is to be adopted by [RB].

It is also of some significance to the [c]ourt that the child, TAW, not be forced to live in limbo for the rest of his young life.  As it stands now, if the adoption were not granted, the child, TAW, would be in the position of having a natural

15

Finally, the trial court entered the following conclusions of law:

1)  The above Findings of Fact have been proven beyond a reasonable doubt.

. . . .

7)  [CW] has been provided with access to reasonably available and culturally appropriate preventative, remedial, or rehabilitative services.  The Shoalwater Bay Indian Tribe, and the Washington State Department of Corrections have actively worked with [CW] to engage him in remedial services and rehabilitation programs beyond simply providing referrals to such services.

8) [CB] actively engaged in preserving the family unit, and at the same time protect herself from further serious harm, between April 2009 and June 13, 2013.

9)  Any future contact between the child, TAW, and [CW] is likely to result in serious emotional or physical damage to the child.

10)  It is in the child's best interest that [CW's] parental rights be terminated.

CP at 66-67.

CW appeals the termination of his parental rights and the order granting the adoption petition of TAW.

ANALYSIS

CW argues that the trial court erred when it (1) concluded that CB and RB had engaged in "active efforts" based on its conclusions that visitation was not a remedial service and that CB and RB's efforts to provide remedial services after 2012 would have been futile, (2) concluded that Lawrence was qualified as an expert witness under ICWA based on its erroneous finding that Lawrence had over 30 years of experience as a GAL, and (3) concluded that continuing CW's

---

father whom he is not able to see because of various restraining orders and protection orders, and the unlikelihood that any of those would change, and that the present active and loving father-figure could never be his "legal father".  Common sense and traditional notions of decency and a fair application of existing law should keep this from happening.

CP at 66 (FF G) (citation omitted).

16

parental rights would likely result in serious emotional or physical damage to TAW. These arguments are either waived or fail.

## I. Legal Principles and Background

ICWA was enacted to protect Native American children, families, and tribes from "'abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" *T.A.W.* II, 186 Wn. 2d at 841 (quoting *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642, 133 S. Ct. 2552, 186 L. Ed. 2d 729 (2013)). ICWA, and the state equivalent WICWA, apply when the child qualifies as an Indian child;[14] the parents' status is not relevant. *T.A.W.* II, 186 Wn.2d at 847, 857. Additionally, ICWA and WICWA apply in stepparent adoption cases. *T.A.W.* II, 186 Wn.2d at 850-51.[15]

Under both ICWA and WICWA, before a trial court can terminate the relationship between the Indian child and the child's parent, the party seeking to terminate the parental rights must also establish that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d); *see also* RCW 13.38.130(1). The petitioning party must

---

[14] The parties do not dispute that TAW is an Indian child.

[15] We are aware that a federal district court in Texas concluded that ICWA was unconstitutional for many reasons, including that it violates equal protection and improperly requires state agencies to apply federal standards to state claims. *Brackeen v. Zinke*, 338 F. Supp. 3d 514 (N. D. Texas, 2018). The parties do not raise any issue with respect to ICWA's or WICWA's constitutionality, so we do not address the constitutionality of ICWA or WICWA. We note that although, *Brackeen* was reversed by the Fifth Circuit Court of Appeals, a motion for rehearing was recently granted in the appeal. *Brackeen v. Bernhardt*, 937 F.3d 406, *rehearing granted*, ___ F.3d ___, 2019 WL 5847349 (Fifth Cir., 2019).

establish active efforts by clear, cogent, and convincing evidence. *In re Dependency of A.M.*, 106 Wn. App. 123, 134-35, 22 P.3d 828 (2001). The active efforts requirement applies to privately initiated terminations. *T.A.W.* II, 186 Wn.2d at 854.

Additionally, under both ICWA and WICWA, in order to terminate parental rights, the trial court must find, based on evidence "including testimony of a qualified expert witness," that the petitioning party has proved beyond a reasonable doubt "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f); RCW 13.38.130(3).

When reviewing termination and adoption orders under ICWA or WICWA, we determine whether the trial court's findings of fact are supported by substantial evidence from which a rational trier of fact could find the necessary facts by the relevant evidentiary standard. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010). Substantial evidence exists when the evidence would persuade a fair-minded rational person of the truth of the declared premise. *L.N.B.-L.*, 157 Wn. App. at 243. We defer to the finder of fact "on issues of witness credibility and the persuasiveness of the evidence." *L.N.B.-L.*, 157 Wn. App. at 243. Unchallenged findings are verities on appeal. *L.N.B.-L.*, 157 Wn. App. at 243.

We review the trial court's conclusions of law de novo to determine whether the trial court's findings support the conclusions of law. *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 871, 439 P.3d 694 (2019). We review conclusions of law erroneously characterized as findings of fact as conclusions of law. *A.L.C.*, 8 Wn. App. 2d at 871.

## II. ACTIVE EFFORTS

CW first challenges the trial court's conclusion that there had been "active efforts" to provide him with remedial services and rehabilitative programs designed to prevent the breakup of the Indian family as required under ICWA because CB and RB failed to "facilitate visitation" between TAW and CW after 2012. Specifically, CW argues that (1) the trial court erred when it concluded that "facilitating visitation" [16] was not a remedial service, [17] and (2) CB and RB failed to facilitate visitation by making an active effort to make domestic violence counseling available for CW when such counseling was a precondition to visitation. [18]

CB and RB concede that "the case law and statute" establish that facilitating "visitation can be a part of active efforts," but they assert that facilitating visitation was not appropriate under the circumstances here. Br. of Resp't at 22. They also assert that they clearly showed that active efforts were made to facilitate visitation to the extent possible. We agree that facilitating visitation can be part of an active effort to preserve a family, and we also agree with CB and RB that active efforts were made to facilitate visitation.

---

[16] We recognize that the trial court appears to have concluded that "'visitation is not itself considered a service,'" not whether facilitating visitation can be a remedial service. CP at 61 (FF C) (quoting *S.B.-L.*, 2014 WL 4198289 *6). But this conclusion also suggests that the trial court was unwilling to consider whether CB and RB's failure to facilitate visitation weighed against finding that they engaged in active efforts to prevent the breakup of the Indian family.

[17] This argument relates to CW's assignments of error 2 and 7 and challenges the portion of the trial court's unnumbered finding of facts in part C of its findings of fact, in which the trial court states, "But visitation is not one of the requirements under the statute." CP at 61 (FF C); Br. of Appellant at 1-2. This statement is more properly characterized as conclusion of law. *A.L.C.*, 8 Wn. App. 2d at 871.

[18] This argument relates to CW's assignments of error 1, 3, and 7.

A.  FACILITATING VISITATION

We first address whether facilitating visitation can be an active effort.  We hold that it can.

Under WICWA, CB and RB were required to "make timely and diligent efforts to provide or procure . . . services, including engaging the parent . . . in reasonably available and culturally appropriate preventative, remedial or rehabilitative services."  RCW 13.38.040(1)(a).  WICWA defines "active efforts," as "a documented, concerted, and good faith effort to facilitate the parent's . . . receipt of and engagement in" the "remedial services and rehabilitation programs."  RCW 13.38.040(1)(a)(iii), (b).  But this definition does not help determine whether facilitating visitation is a remedial service or rehabilitative program because the statute does not specify what remedial services or rehabilitative programs are required or recommended.  Similarly, "ICWA . . . does not define 'active efforts,' nor does it indicate the requisite amount of services required before the termination of parental rights may occur."  *T.A.W.* II, 186 Wn.2d at 842.

A federal regulation, however, is helpful.  25 C.F.R. § 23.2 defines active efforts and suggests that supporting visitation is among the actions that can help establish active efforts.  25 C.F.R. § 23.2 provides, in part:

> *Active efforts* means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family.  Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan.  To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe.  *Active efforts are to be tailored to the facts and circumstances of the case and may include, for example*:
>
> . . . .

(7) *Supporting regular visits with parents* or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, *consistent with the need to ensure the health, safety, and welfare of the child*[.]

(Emphasis added).

Additionally, the cases CW cites, *In re Crystal K.*, 226 Cal. App. 3d 655, 276 Cal. Rptr. 619 (1990), and *In re Interest of C.A.V.*, 787 N.W. 2d 96 (Iowa 2010), support his assertion that facilitating visitation can be considered when evaluating whether active efforts were made. In *Crystal K.*, the basis for the parental termination proceeding was the biological father's alleged abandonment of the child. 226 Cal. App. 3d at 666-67. The California Court of Appeals stated that the remedial efforts had to be directed at remedying the basis for the parental termination proceeding, abandonment, and that the mother could "meet [the] remedial and rehabilitative services requirement by proving, for example, that efforts have been made to contact the tribe to assist in maintaining the relationship between [the biological father and the child.]" 226 Cal. App. 3d at 667. We agree that *Crystal K.* demonstrates that facilitating visitation that maintains a relationship between parent and child can be an example of an active effort.

Similarly, in *C.A.V.*, the Iowa Court of Appeals held that the mother had satisfied the active efforts requirement, in part, by taking steps to ensure that her daughter maintained contact with the father, even after his incarceration. 787 N.W.2d at 103. Again, we agree that *C.A.V.* demonstrates that facilitating visitation can be an example of an active effort.

As 25 C.F.R. § 23.2 and these cases show, facilitating an ongoing relationship between the child and the parent is one of many possible active efforts CB and RB could have engaged in in order to help prevent the breakup of the family.

21

But *Crystal K.*, *C.A.V.*, and C.F.R. § 23.2 do not *require* facilitating visitation in all circumstances. "Active efforts are to be tailored to the facts and circumstances of the case." 25 C.F.R. § 23.2. And the final clause of 25 C.F.R. § 23.2(7) requires that the child's contact with the parent be "consistent with the need to ensure the health, safety, and welfare of the child." 25 C.F.R. § 23.2(7).

Here, there were protection orders prohibiting contact, which is strong evidence that contact between CW and TAW was not "consistent with the need to ensure the health, safety, and welfare of the child."[19] 25 C.F.R. § 23.2(7). And CW does not cite any case law establishing that facilitating visitation is required when there is an active protection order in place. Essentially, facilitating visitation was not reasonably available, and a parent has no duty to provide a resource that is not reasonably available. RCW 13.38.040(1)(a); *C.A.V.*, 787 N.W. 2d at 103. Here, where there were protection orders prohibiting CW's contact with TAW until CW complied with a domestic violence treatment requirement, CB and RB cannot be faulted for failing to facilitate visitation between CW and TAW after September 2012.

---

[19] CW argues the portion of the trial court's ruling that states, "This [c]ourt cannot order [CB] to foster a relationship between the [c]hild and [CW] that the Tribe forbids," implies that the Tribe forbade contact between CW and TAW. Br. of Appellant at 20; CP at 62 (FF D). He contends that this statement is incorrect because the Tribe did not seek the protection order. CW is correct that it was CB, not the Tribe, who obtained the protection order. But, read in context, the trial court was not asserting that the Tribe forbade the contact. Rather the trial court was stating that it must give effect to an order issued by the Tribal court.

B.  DOMESTIC VIOLENCE TREATMENT

CW further argues that the evidence did not support the trial court's conclusion of law that CB and RB engaged in active efforts after 2012 because CB and RB did not contact the Tribe to attempt to facilitate the domestic violence treatment that was required for CW to be able to challenge the protection orders issued in September 2012 and October 2015. As discussed below, the findings of fact support the trial court's conclusion of law.

Although CB and RB were not obligated to facilitate visitation when the protection orders were in place,[20] they still had an obligation to make active efforts to provide the remedial or rehabilitative services that were reasonably available under the circumstances. Arguably, they could have provided support by assisting CW in accessing the domestic violence resources when CW was not incarcerated. Once CW was arrested and incarcerated, however, CB and RB no longer had any ability to provide for any such remedial services. Thus, we examine whether CB and RB could have provided support during the periods CW was not incarcerated after the protection orders were issued.[21]

CW was released from prison in September 2012 and remained in the community until he was rearrested in January 2013. The trial court found that CB obtained a Tribal court domestic violence protection order preventing CW from contacting her or TAW shortly after CW's September 2012 release from prison. On October 10, 2012, CW successfully moved to modify

---

[20] The September 2012 protection order was in place until, at the least, the time of the 2018 trial. The October 2015 protection order expired on October 14, 2018.

[21] The first domestic violence protection order was issued on September 12, 2012. The second domestic violence protection order was issued on October 14, 2015.

this order to allow for purging conditions that would allow him to petition for a rehearing on the matter "[u]pon at least 6 months of [domestic violence] classes/programs." CP at 50 (FF A48). The trial court also found that on October 10, Horne advised CW that the Tribe would pay for any treatment he needed even though he was no longer married to CB. The trial court further found that CW did not take advantage of this offer.

The trial court's finding that the Tribe offered to pay for treatment establishes that remedial services were in fact offered to CW when the September 2012 protection order was issued.[22] Accordingly, the trial court did not err when it concluded that the active efforts requirement was satisfied during the period of time between CW's September 2012 release and his January 2013 arrest.

CW was released from incarceration in September 2015 and was in custody again by approximately June 2016.[23] In October 2015, CB obtained another Tribal court domestic violence protection order prohibiting contact between CW and TAW. The trial court found that this protection order did *not* contain a purging condition, and CW does not challenge this finding so it is a verity on appeal. *L.N.B.-L.*, 157 Wn. App. at 243. Because this protection order did not contain

---

[22] CW argues that "C.B. did not contact the Tribe to attempt to facilitate the provision of [the domestic violence treatment]. In order to make 'active efforts,' CB could have--and should have--contacted the Tribe to pay for and facilitate this service. CB sat on her hands." Br. of Appellant at 19 (citations omitted). Given this statement, CW may also be arguing that CB and RB, rather than the Tribe, were required to supply the resources. But CW cites no authority requiring petitioners in the termination action to facilitate the provision of treatment when those services have already been offered to the parent by another entity. Accordingly, we do not further address this argument. *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

[23] The trial court made findings as to the dates of CW's 2016 offenses and his 2016 pleas, but it did not make a finding as to when CW returned to custody. It is most likely that he was in custody by the time he pleaded guilty to taking a motor vehicle without permission in June 2016.

a purging condition, and there was such a short time between CW's release in September 2015 and the issuance of the October 2015 protection order, there were no services CB and RB could have provided to facilitate TAW's visitation with CW when he was in the community from September 2015 to approximately June 2016. Furthermore, even if there had been a purging condition, Horne had already told CW that the Tribe would help facilitate any necessary treatment. Accordingly, the trial court did not err when it concluded that the active efforts requirement was satisfied during the period of time between CW's September 2015 release and his next incarceration in or around June 2016.

Although the trial court erred when it concluded that facilitating visitation was not a remedial service that CB and RB were obligated to make active efforts to provide, such services were either not reasonably available or were provided. And CW does not show that the trial court erred when it concluded that CB and RB had proved they had made active efforts to provide CW with remedial services and rehabilitative programs designed to prevent the breakup of the Indian family as required under ICWA.

C. FUTILITY

CW further argues that the trial court erred in applying "some sort of futility doctrine to excuse [CB and RB] from" making an active effort to facilitate visitation. Br. of Appellant at 19-20. Citing *In re J.L.*, 483 Mich. 300, 770 N.W.2d 853 (2009), CW asserts that other courts have rejected application of the "futility doctrine" in the ICWA context. This argument fails.

Although the trial court used the term "futile," it did not use the term in the same sense that it was used in *J.L.* CP at 61-63 (FF D). Instead, the trial court here was discussing whether the service was *reasonably available* under the circumstances of the case. *See* RCW 13.38.040(1)(a)

(petitioners are required to "[m]ake timely and diligent efforts to provide or procure . . . services, including engaging the parent . . . in *reasonably available* and culturally appropriate preventative, remedial or rehabilitative services.")  (Emphasis added).

Under RCW 13.38.404(1)(a), CB and RB were required to make active efforts to provide "reasonably available" remedial or rehabilitative services.  And "[a]ctive efforts are to be tailored to the facts and circumstances of the case."  25 C.F.R. § 23.2.  Excusing petitioners from having to make active efforts to provide services that were not reasonably available to the respondent is a method of tailoring the active efforts to the facts and circumstances of the case.  CW cites no authority requiring the trial court to require the petitioners to attempt to provide services that are not reasonably available under the circumstances.  RAP 10.3(a)(6); *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

Furthermore, even if the trial court was attempting to apply a futility doctrine and that approach was improper, "[e]rror without prejudice . . . is not grounds for reversal." *In re Welfare of M.G.*, 148 Wn. App. 781, 791, 201 P.3d 354 (2009).  As discussed above, CW does not show that the trial court erred when it concluded that CB and RB had proved they had made active efforts to provide him with remedial services and rehabilitative programs designed to prevent the breakup of the Indian family as required under ICWA, thus, even if the trial court improperly referred to a futility doctrine, any such error was harmless.

### III.  QUALIFIED EXPERT WITNESS

CW next argues that the trial court erred in concluding that Lawrence was a qualified expert witness because it relied on the "faulty premise" that he had 30 years of experience as a GAL and because Lawrence lacked experience with ICWA and Indian families.  CW has waived the

argument regarding whether Lawrence was a qualified expert witness under ICWA; thus, whether the finding that Lawrence had 30 years of experience as a GAL is harmless.

Both ICWA and WICWA require that before a court can involuntarily terminate the parental rights of a parent of an Indian child, the petitioning party must provide "testimony of a qualified expert witness" establishing beyond a reasonable doubt that the continued relationship with that parent is likely to result in serious emotional or physical damage to the child.[24] 25 U.S.C. § 1912(f); RCW 13.38.130(3). However, a party's failure to object to the witness's qualifications

---

[24] ICWA provides:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f).

Under RCW 13.38.130(4)(b), a person seeking to terminate the parental rights to an Indian child must identify a witness who meets one or more of the following criteria:

> (i) A member of the child's Indian tribe or other person of the tribe's choice who is recognized by the tribe as a knowledgeable regarding tribal customs as they pertain to family organization are child rearing practices for this purpose;

> (ii) Any person having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and child rearing practices within the Indian child's tribe;

> (iii) Any person having substantial experience in the delivery of child and family services to Indians, and knowledge of prevailing social and cultural standards and child rearing practices in Indian tribe's with cultural similarities to the Indian child's tribe; or

> (iv) A professional person having substantial education and experience in the area of his or her specialty.

27

at trial waives the issue on appeal. ER 103(a); RAP 2.5(a).[25] CW did not object to Lawrence's testimony based on whether Lawrence was a qualified to testify as a qualified expert witness. Thus, he has waived this issue.

CW also argues that the trial court's finding of fact that Lawrence had 30 years of experience as a GAL is not supported by the evidence. Although we agree that the evidence does not support this finding because Lawrence testified that he had only one year of experience as a GAL, because CW did not challenge Lawrence's qualifications as an expert witness under ICWA, this error is harmless.

## IV. SERIOUS EMOTIONAL OR PHYSICAL DAMAGE

Finally, CW argues that the trial court's conclusion that a continued relationship between him and TAW is likely to result in serious emotional or physical damage to the child is not supported by substantial evidence. We disagree.

Under ICWA and WICWA, CB and RB have the burden of proving beyond a reasonable doubt that "custody of the child by [CW] . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f), RCW 13.38.130(3). The trial court concluded that they had carried their burden. We agree with the trial court.

---

[25] *See also In re Interest of R.L.F.*, 437 N.W.2d 599, 602 (Iowa, 1989) (failure to object waived "any improprieties in" expert's testimony); *In re Interest of B.L.L.S.*, 557 S.W.3d 486, 494 (Mo., 2018) (failure to object waived argument regarding whether witness was qualified expert witness); *In re Interest of D.A.C.*, 933 P.2d 993, 1002 (Ut., 1997) (failure to object to testimony by mother's witness on grounds that witness was not a qualified expert witness waived the issue on appeal).

The trial court found, based on Lawrence's testimony, that continuing the relationship between CW and TAW could be "very destructive" because CW would likely be incapable of maintaining the relationship and, due to TAW's "state of development," TAW could "internaliz[e]" the problems in the relationship and start to believe that he was at fault. CP at 64 (FF E). In addition, the trial court found that CW has issues with impulsivity; continued drug addiction; and a history of untreated domestic violence against CB, and there was a chance that TAW could witness such violence. The trial court also noted that CW had not been part of TAW's life for at least seven years, that CW had an extensive criminal record, and that CW was at high risk of reoffending upon release.

The trial court further considered the need for finality to allow TAW to fully integrate into his existing family, noting that it was unlikely that TAW and CW could achieve a real relationship in light of "various restraining orders and protection orders, and the unlikelihood that any of those would change[.]" CP at 66 (FF G). These findings, as a whole, support the trial court's conclusion that continued contact between CW and TAW was likely to result in serious emotional damage to TAW.

CW argues, however, that Lawrence's testimony did not support the conclusion of law stating that CW's continued legal relationship to TAW would likely result in serious emotional or physical harm to TAW because Lawrence (1) did not discuss TAW's physical well-being, (2) merely suggested that TAW could be disappointed, and (3) did not establish how CW's continued

legal relationship with TAW could damage his secure and stable home with CB and RB.[26]  This argument is unpersuasive.

First, the trial court was not required to find that the relationship could be *both* emotionally *and* physically harmful.  25 U.S.C. § 1912(f) (court must find that continued custody "is likely to result in serious emotional *or* physical damage to the child").  So there was no need for evidence regarding TAW's physical well-being.

Second, Lawrence testified that it was unlikely CW could maintain a relationship with TAW and that, because of his age, TAW could blame himself for this failure, which would be "very destructive."  CP at 64 (FF E).  Lawrence's testimony that TAW would take responsibility for CW's failures and that this would be "very destructive" to TAW is more than an assertion that TAW could be disappointed.  Instead, this statement is evidence that a continued relationship with CW was potentially emotionally damaging to TAW.

---

[26] In their argument, CB and RB refer to other evidence that was not included in the trial court's findings of fact.  Because the trial court's conclusion of law, that continued contact between CW and TAW was likely to result in serious emotional damage to TAW, is a conclusion of law, we do not consider evidence presented that was not part of the trial court's written findings of fact in our analysis.  *A.L.C.*, 8 Wn. App. 2d at 864 (we review the trial court's conclusions of law de novo to determine whether the trial court's findings support the conclusions of law); *L.N.B.-L*, 157 Wn. App. at 249 (treating conclusion that continued custody of child by parents is likely to result in serious emotional or physical damage to the child as a conclusion of law); *Casterline*, 168 Wn. App. at 382-83 (2012) (determinations made by a process of legal reasoning from the facts in evidence are conclusions of law).

Additionally, although the trial court was required to consider testimony from a qualified expert witness, the trial court was not restricted solely to Lawrence's testimony.[27] Lawrence's testimony in conjunction with the other evidence revealed CW's past inability to maintain any kind of relationship with TAW, his failure to seek or successfully complete treatment that would assist him in having a relationship with TAW, and the existence of domestic violence and CW's failure to seek treatment for his domestic violence issues. These facts, combined with Lawrence's testimony, support the trial court's conclusion that there was a likelihood of serious emotional harm beyond a reasonable doubt.

CW also notes that Lawrence recognized that CW and his family objected to the termination because they did not want TAW to think CW had given up on him and argues that the risk of thinking that his natural father did not want him would be far more damaging to TAW than the possibility that CW would "disappoint[ ]" him. Br. of Appellant at 31. CW does not direct us to anything in the record establishing that the trial court failed to balance the risk of harm to TAW due to severing CW's parental rights with the risk of harm to TAW caused by maintaining the relationship. And, despite CW's assertion that he wanted to maintain a relationship with his son, CW's actions have not been consistent with this claim. Beyond opposing the termination and

---

[27] 25 U.S.C. § 1912(f) ("No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, *including* testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added).); RCW 13.38.130(3) ("No involuntary termination of parental rights may be ordered in a child custody proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, *including* testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.") (Emphasis added.)

adoption petitions and successfully moving to have a purging clause added to one of the protection orders, CW's actions overwhelmingly demonstrated that he was unable or unwilling to do what it would take to have a relationship with TAW because he (CW) repeatedly failed to engage in the services offered and repeatedly engaged in behavior that placed his ability to be part of TAW's life in peril. Accordingly, this argument fails.

CW also asserts that the trial court relied in part on the fact that the Tribe approved the adoption and argues that the Tribe's approval was not relevant to whether the continued relationship would cause serious damage. There is nothing in the trial court's findings of fact and conclusions of law suggesting that the trial court considered the Tribe's approval when determining the serious emotional or physical damage element. Accordingly, this argument fails.

CW further contends that the trial court erred in considering the past domestic violence because the domestic violence was solely between CW and CB, CB was now in a stable relationship with someone else, and CB could maintain no contact orders prohibiting contact between her and CW. CW argues that "[t]he circumstances do not show any likelihood of domestic violence occurring within the sight or sound of TAW." Br. of Appellant at 32.

But the trial court found that CW had an extensive history of untreated domestic violence with CB, that CW had raped CB before their marriage,[28] and that CW had struggled with impulsivity and drug use that resulted in his criminal behavior. The trial court also found that CW had previously been convicted for violating a domestic violence protection order. Given CW's history of abuse, rape, impulsivity and drug use, and prior violation of a domestic violence court

---

[28] Sometime before their marriage, CW raped CB.

order, the trial court properly concluded that there was a risk of exposing TAW to domestic violence should CW retain his parental rights because contact or interaction with CB would be difficult to avoid. Thus, we are not persuaded by this argument.

CW next argues that the trial court improperly relied on "abandonment" when the record showed that CW's lack of contact with TAW was due to CB's actions and that our Supreme Court had expressly rejected an abandonment finding in the first appeal. Br. of Appellant at 32. Regardless of whether the findings of fact supported this conclusion, this error is harmless.

Prior to its repeal in 1984, the termination statute required the trial court to determine "whether such parent has deserted or abandoned the child under circumstances showing a willful substantial lack of regard for parental obligations." Former RCW 26.32.056 (1979), *repealed by* Laws of 1984, ch. 155 § 38. But the current statute, RCW 26.33.120, does not require an abandonment finding.[29] *In re Adoption of McGee*, 86 Wn. App. 471, 476, 937 P.2d 622, 625 (1997). Furthermore, because TAW is an Indian child, CB and RB had to meet the test from ICWA, which likewise does not require an abandonment finding. *See* 25 U.S.C. § 1912(f) (requiring petitioner to establish beyond a reasonable doubt "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child"). Thus, the trial court's abandonment finding is error. However, as discussed above, the trial court's other findings support the termination; therefore, any error is harmless.

---

[29] We note that trial court's findings cite to *In re Adoption of Lybbert*, 75 Wn.2d 671, 453 P.2d 650 (1969), and former RCW 26.32.040(4) (1976). CP at 65-66 (FFs F 1, F 2d). *Lybbert* is inapplicable here because it addresses the prior adoption statute, former RCW 26.32.040 (1955), which required a showing of abandonment. And former RCW 26.32.040 (1976) is irrelevant because it was repealed in 1979. Laws of 1979, Ex. Sess, ch. 165 § 23.

CONCLUSION

We hold that although facilitating visitation can be a remedial service, it was not reasonably available under the circumstances of this case after September 2012. Thus, CW does not show that the trial court erred when it concluded that CB and RB had proved they had made active efforts to provide CW with remedial services and rehabilitative programs designed to prevent the breakup of the Indian family as required under ICWA. We further hold that CW waived his argument challenging the GAL's qualifications as a qualified expert witness and that, in light of this holding, any error in the trial court's finding that the GAL had 30 years of experience is harmless. Finally, we hold that the trial court's findings support its conclusion that continuing CW's parental rights would likely result in serious emotional or physical damage to TAW. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MAXA, C.J.

LEE, J.